**In re KELLER FINANCIAL SERVICES OF FLORIDA, INC., et al., Debtors.**

**No. 98–5299–8G1, 98–5361– 8G1 to 98–5369–8G1.**

United States Bankruptcy Court, M.D. Florida, Tampa Division.

April 14, 2000.

• John K. Olson, and Mark J. Bernet, Sterns, Weaver, Miller, Weissler, Alhadeff & Sitterson, P.A., Tampa, FL, for Trustee, Kevin O'Halloran.

• Catherine Peek McEwen, Akerman, Senterfitt & Eidson, P.A., Tampa, FL for Domenic L. Massari, III, and Massari Law Group.

• Domenic L. Massari, Tampa, FL, for Domenic L. Massari and Massari Law Group.

• Edward M. Waller, Jr., Fowler, White, Gillen, Boggs, Villareal and Banker, P.A., Tampa, FL, for Rebecca Bell.

• Rufus T. Dorsey, IV, Parker, Hudson, Rainer & Dobbs, Atlanta, GA, Douglas P. McClurg, Hill, Ward & Henderson, Tampa, FL, for Official Committee of Noteholders;

• Theresa M. Boatner, Tampa, FL, U.S. Trustee.

• David S. Jennis, Williams, Reed, Weinstein, Schifino & Mangione, P.A., Tampa, FL, for Debtors, Keller Financial Services of Florida, Inc., et al.

• Anthony S. Battaglia, and Kelli Hanley Crabb, Battaglia, Ross, Dicus & Wein, St. Petersburg, FL, for Brian R. Keller.

## FINDINGS OF FACT, CONCLUSIONS OF LAW, AND MEMORANDUM OPINION

PAUL M. GLENN, Bankruptcy Judge.

**THIS CASE** came before the Court for a final evidentiary hearing to consider a Motion for Order Directing Debtors' Attorneys to Return Excessive Payments filed by Kevin O'Halloran, the Chapter 11 Trustee (the "Trustee"). The Motion initially was directed to Domenic L. Massari, III, Rebecca R. Bell, The Massari Law Group, P.A., and Massari & Bell, P.A. On June 21, 1999, the Court granted the motion of Rebecca Bell for the involuntary dismissal of the Trustee's claim against her, and denied the Trustee's Motion as to Rebecca Bell.

The Trustee contends that Domenic L. Massari, III and Massari & Bell, P.A. (collectively, the "Respondents") received the total sum of $2,142,380.23 from the Debtors between July of 1997 and March of 1998. The money was paid to the Respondents as compensation for legal services provided or to be provided. Massari & Bell, P.A. previously returned $300,000 to the estate in accordance with the Court's Order entered on July 2, 1998. The Court has also ordered Massari & Bell, P.A. to return $683,543.69 by Order entered September 3, 1999.

In the Trustee's Post–Trial Brief, the Trustee requests that the Court enter an Order directing the Respondents to disgorge the total amount received by them, less amounts previously returned. The Trustee's request primarily is based on § 329 of the Bankruptcy Code and Rule 2017 of the Federal Rules of Bankruptcy Procedure. Essentially, the Trustee contends that the Respondents should be required to disgorge the full amount received because they failed to disclose material facts to the Court, because their employment was never authorized by the Court, and because the compensation exceeds the reasonable value of the services provided.

### Table of Contents

I. Background; Massari; Retention Proposals and Payments ......................868
 A. Background.......................................................868
 B. Domenic L. Massari, III; Massari & Bell, P.A.; and the Massari Law
 Group........................................................869
 C. Retention proposals, and payments .................................870
 1. Initial contacts; the July 24, 1996, retention proposal. ..................870

**868**

 2. The March 5, 1997, retention letter ...................................871
 3. The June 11, 1997, retention letter. ................................872
 4. The payment to Media Marketing Associates. ........................873
 5. Opinion letters for the bulk sales of loans. ..........................873
 6. The December 15, 1997, retention letter...............................874
 7. The Letter of Direction. ............................................875
 8. Termination of the employee retention fund ..........................875
 9. The March, 1998, invoice ..........................................875
 D. Total payments...........................................................876
 E. The Filings...............................................................876

II. Section 329, and Rules 2016 and 2017 ......................................876
 A. "...in contemplation of or in connection with the case..."..................877
 1. Interpretation....................................................877
 2. The evidence. ...................................................879
 3. Application ......................................................880
 4. Exploration of alternatives. ......................................881
 B. "...shall file with the court a statement of the compensation paid or
 agreed to be paid, and the source of such compensation."...................883
 1. Interpretation....................................................883
 2. Nondisclosure of compensation. ..................................883
 3. Sanction for nondisclosure. ......................................885
 C. "...exceeds the reasonable value of any such services..." ..................887
 1. Reasonable value of services pursuant to March 5, 1997, letter. ...........888
 2. Reasonable value of services for opinion letters .........................889
 3. Total reasonable value. ...........................................890

III. Section 327, and Rule 2014 ...............................................890
 A. "...with the court's approval..." ........................................891
 B. "...that do not hold or represent an interest adverse to the estate, and
 that are disinterested persons..." ...................................892
 1. Interpretation....................................................892
 2. Assertions. .....................................................893
 3. Conclusion. .....................................................895
 C. "...a verified statement...setting forth the person's connections..." ........897
 1. Interpretation....................................................897
 2. The disclosure ..................................................898
 3. Nondisclosure of connections with insiders ...........................899
 4. Sanction for nondisclosure ........................................901

IV. Sections 328 and 329, and the Nature of Retainers ...........................903

V. Conclusion ..............................................................906

## I. Background; Massari; Retention Proposals and Payments

### A. Background.

In 1992, Brian Keller and other individuals formed Keller Financial Services of Florida, Inc. The corporation was formed to make loans to individuals to purchase vehicles. Generally, the loans were made to borrowers who could not obtain financing from traditional sources, and such loans are known as subprime automobile loans. The corporation was owned principally by Brian Keller.

Initially, the funds for making the loans were raised from investors. The investors were issued notes secured by the subprime automobile loans. After the first note offering by Keller Financial Services of Florida, Inc. ("KFS of Florida"), other corporations were formed for the same purpose. These corporations were subsidiaries of KFS of Florida, and were Keller Financial Services of Central Florida, Inc., Keller Financial Services of Clearwater, Inc., Keller Financial Services of Mid Florida, Inc., Keller Financial Services of North Florida, Inc., Keller Financial Ser-

vices of Pinellas, Inc., Keller Financial Services of St. Petersburg, Inc., Keller Financial Services of Sun Coast, Inc., Keller Financial Services of Tampa Bay, Inc., and Keller Financial Services of West Florida, Inc. (KFS of Florida and these subsidiaries are sometimes referred to as "financing affiliates.")

Also in 1992, Brian Keller and other individuals formed Keller Financial Services, Inc. Keller Financial Services, Inc. ("KFS") was not a subsidiary of KFS of Florida, but was owned principally by Brian Keller. KFS provided all of the operating and administrative services for the financing affiliates, including locating and acquiring the loans, collecting and servicing the loans, handling funds for the financing affiliates, and the related accounting and management services. KFS was not intended to operate at a profit, but all of its expenses were allocated among and reimbursed by the financing affiliates for which it performed the servicing. (Tr. 4–30–99, p.83–84).

From February 1992 through July 1995, the financing affiliates issued 22 secured note offerings, and raised a total of approximately $140 million.

By late 1995, the financial condition of the financing affiliates began to deteriorate. The companies needed to continue to operate, but management did not believe that the companies could raise the funds through the method of secured note offerings which they previously had used. In January, 1996, an additional $15 million was raised through the sale of preferred stock of KFS of Florida.

In June, 1996, a newly hired assistant comptroller, Angela Esposito, prepared the first of a series of analyses identified as "static pool analyses." Each of these analyses focused on loans originated in a particular month and analyzed the performance of those loans over time. Esposito explained that such analyses show trends of the performance of the loans. She testified that these analyses showed that the loans had significant delinquencies. (Tr.

4–30–99, p.90). In October, 1996, the comptroller of the companies resigned, and Esposito was promoted to comptroller. Esposito began preparing the balance sheets for the companies. Esposito testified that at that time the liabilities of the companies exceeded their assets. (Tr. 4–30–99, p.91).

By December, 1996, the companies needed additional cash for continuing operations. Management had determined that the companies could not raise funds through public offerings of either debt or equity. Six times between December, 1996, and December, 1997, the companies raised cash by selling some of their loans in bulk.

It appears that most of the legal work for the companies from 1992 through 1995 was securities work. For this work, the companies used Michael Williams, a lawyer who specialized in securities and general business law. Most of Williams' legal services were the securities services associated with the secured note financings and the preferred stock offering. Williams also provided some general business legal advice.

### B. Domenic L. Massari, III; Massari & Bell, P.A.; and the Massari Law Group.

Domenic L. Massari, III ("Massari") has practiced law in Tampa for more than 20 years. Massari's practice developed as a bankruptcy, litigation, transaction, and general commercial practice. After a few years, "[T]he central theme of my work all became lost causes . . . . when they needed the lawyer of last resort, basically, that's who showed up in my office, and they were always complex, difficult, convoluted-type cases." (Tr. 5–4–99, p.46).

In 1990, Massari incorporated his own firm, Domenic L. Massari, III, P.A. Subsequently Massari's wife, Rebecca Bell, joined his practice, and the firm became Massari & Bell, P.A. Massari's work was bankruptcy and general commercial work.

Rebecca Bell's practice was a mediation and adoption practice.

Rebecca Bell incorporated Rebecca R. Bell, P.A. in April, 1996, and by January, 1997, she was no longer a shareholder of Massari & Bell, P.A. (Tr. 5–4–99, p.19). She remained as an employee of Massari & Bell, P.A. until around October, 1998. (Tr. 5–4–99, p.22). However, Rebecca Bell never performed any legal services of any type for any of the Keller entities. (Tr. 5–4–99, p.13).

Massari Law Group is a trade name for Massari & Bell, P.A. (Stipulation of Facts filed April 30, 1999, ¶ 12).

## C. Retention proposals, and payments.

### 1. Initial contacts; the July 24, 1996, retention proposal.

In April or May, 1996, Michael Williams introduced Brian Keller to Domenic Massari. Williams testified: "... it's my practice with any client I represent if there are financial difficulty issues to suggest to them that they seek bankruptcy counsel, not necessarily because I think they should enter bankruptcy, but if you're going to consider it as an option, you have to understand what it is, and I'm not a bankruptcy lawyer. And, so, I always think it's appropriate to bring in a bankruptcy lawyer to have them explain to a client what it is and how it works and what's going to happen." (Tr. 4–30–99, p.171).

In early July, 1996, Massari met with Brian Keller and three other officers of the Keller companies. At that point, Massari understood that "their primary goal was merger and consolidation, but that they wanted to know the worst-case scenario in bankruptcy." (Tr. 5–4–99, p.77). They disclosed to Massari "what they believed their losses were and what they believed the worst case scenario at that time was." (Tr. 5–4–99, p.77). Later in the month, on July 23, 1996, Massari met with Brian Keller and Michael Williams. "I stayed late with Brian and was asked to prepare a retention letter to assist the company with a workout litigation and, if ultimately necessary, a bankruptcy." (Tr. 5–4–99, p.77).

Following that meeting between Massari and Brian Keller, Massari prepared a letter dated July 24, 1996, from Massari & Bell, P.A. to Brian Keller as President of "Keller Financial Services, Inc.," to serve as "an express fee agreement between Keller Financial Services, Inc. and its affiliates and subsidiaries and Massari & Bell, P.A." (Trustee's Exhibit 1). The proposed scope of representation was:

> ... to assist Keller Financial Services, Inc. and its affiliates and subsidiaries, as currently configured or after a merger or consolidation, in connection with the restructuring of its financial and business affairs on an as needed basis. This representation is intended to include workout negotiations with lenders, restructuring of financial instruments, assisting in structuring and documenting replacement financing and assisting in the changes, if any, to the corporations' structures. Obviously, the scope of work set forth above, could be exceptionally complex and, under certain circumstances, could include the filing of Chapter 11 proceedings. However, as you are aware, our firm has the necessary expertise to assist the corporations in dealing with creditor and debt claims whether in state, federal or Bankruptcy Court.

The letter also provided:

> This letter, when signed by you and returned to us with a check acknowledges our firm's receipt of a $1,500,000 retainer. The retainer will be applied periodically to pay future outstanding balances reflected on our billing statements, and again, if required, is subject to the approval of the Bankruptcy Court.

There is a provision at the end of the letter for Brian Keller to sign the letter on behalf of "Keller Financial Services, Inc. and its affiliates and subsidiaries." Brian Kel-

ler did not sign or return the letter and did not remit a retainer.

In late 1996 and early 1997, Massari was asked to review severance and indemnification trusts which would benefit officers of the Keller companies. " . . . I was asked to review certain provisions in the trusts to give my best advice as to how they would hold up and what changes could be made in them to make them hold up in litigation, class action type litigation, or even in a bankruptcy against a bankruptcy trustee." (Tr. 5–4–99, p.86).

### 2. The March 5, 1997, retention letter.

On March 4, 1997, Brian Keller called Massari. Massari testified:

> And it was a telephone conference with Brian Keller primarily about me being his—I guess his right-hand guy, his go-to guy. . . . He wanted me to do litigation analysis. He wanted me to be available 24 hours a day. He wanted me to report to him on the exposure the company had. He wanted me to look at certain documents. He wanted me to look at relationships with dealers. He wanted me to look at—I mean, there was just—the list went on and on and on, and we negotiated. We talked about the possibility, if a merger didn't work, that there would be a Chapter 11, and I quoted him a fee of a million-and-a half dollars at that time for a Chapter 11.

(Tr. 5–4–99, pp.87–88). Massari continued:

> . . . And Brian stressed to me that no one else in the company, not even Michael Nixon, could know what I was doing because it would panic everybody and the company would fall apart; that they had sustained much greater losses than they thought. . . . Also Brian, in that vein, did not want me to get any payment until December because if I sent an invoice to the company, he felt that Nixon would look me up in Martindale–Hubbell or somebody would, and everybody would know that the jig was up in terms of the fact that the company

was considering restructuring or bankruptcy possibly as one alternative. Everybody would panic. They wouldn't understand that we were going to look at lot of other alternatives, and he would lose his key people to the Duck or something like that.

(Tr. 5–4–99, pp.88–89). Massari testified that he and Brian Keller agreed that:

> . . . I would get a flat fee of $50,000 a month, no set hours. . . . And I would get no payments until December because at that point, he felt that we would know what we were doing and it would basically be known exactly what direction we were moving in.

(Tr. 5–4–99, p.91).

Following that meeting, Massari wrote a letter dated March 5, 1997, on behalf of Massari & Bell, P.A., addressed to Brian Keller at "Keller Financial Services, Inc." The letter references "Keller Financial Services, Inc." Brian Keller was identified in the letter as Chairman of "Keller Financial Services of Florida, Inc." (Trustee's Exhibit 2). Pursuant to the letter, Massari & Bell, P.A. agreed to provide legal services to "Keller Financial Services of Florida, Inc. and its subsidiaries."

> . . . The nature of the services will be to review company financial information, all potential litigation matters, merger, acquisition and sale possibilities. We understand the substantial amount of effort that will be necessitated and also realize that payment would likely not occur until such time as a merger, acquisition, the determination to bulk sale loans or such other major transaction. . . .

The letter continues:

> . . . You have requested that I keep our representation confidential. We may investigate the possibility of a Chapter 11 case as part of our analysis. You have stated that I will have limited interaction with Michael Nixon concerning acquisitions, mergers and the like, but that my overall mission is to remain confidential

and to prepare for you, as Chairman, certain analysis and to be available on an "as needed" basis....

With respect to payment, the letter further provided:

... We have agreed that our firm will receive, by no later than December 31, 1997, a sum representing $50,000 per month from March through December, 1997 for the services described herein. We understand that this arrangement is more in the nature of a general retainer and is not an hourly-based fee, but is based upon our estimates of the work that will be necessary and our being available to devote substantial time to the company as necessary....

... We will not send monthly billings, but we may request some funds prior to December 31, 1997, and, if so, we will do this by a separate bill that will not reflect the contents of this letter.

The letter added:

In the event a Chapter 11 filing is necessitated, I believe that the retainer will have to be in excess of $1,000,000.

Brian Keller did not sign the letter to acknowledge his acceptance of its terms. Massari testified:

... this letter was prepared, I believe, outside of my office and was prepared in a situation that Brian did not want to have to say to anybody that he had signed—if he were asked directly, he did not want to have to acknowledge having signed a retainer agreement or a letter of this type with anybody.

(Tr. 5–4–99, p.96).

### 3. The June 11, 1997, retention letter.

Massari prepared a letter dated June 11, 1997, from Massari & Bell, P.A. to Brian Keller as President of "Keller Financial Services, Inc.," to serve as "an express fee agreement between Keller Financial Services, Inc. and its affiliates and subsidiaries and Massari & Bell, P.A." (Trustee's Exhibit 3). This letter is similar to the letter dated July 24, 1996, except that all references to Chapter 11 proceedings and bankruptcy are omitted, and tax and securities advice is specifically excluded from the services to be rendered. The retainer amount in the letter is $25,000, and services were to be billed on an hourly basis.

The letter was signed on behalf of "Keller Financial Services, Inc. and its affiliates and subsidiaries" by Brian Keller, as President, and his signature is dated June 18, 1997.

Massari testified that this letter "did not represent the retention." (Tr. 6–9–99, p. 54). "I was asked to provide this to receive a payment under my March 5th letter." (Tr. 6–9–99, p.55). "All I can tell you is that the sole purpose of this document was at the client's request to be able to, in a fairly non-threatening way, get $25,000 of the 500 that I was earning." (Tr. 6–9–99, pp.55–56). Massari testified:

And the initial thought that Brian had was that I would give a letter that basically he would explain to people, and he would give me—he would get me money but it wouldn't be paid out of the company. If anybody ever found it or looked at it or saw it, it could be explained as having a much more limited scope of representation.

(Tr. 5–4–99, pp.97–98). Further, with respect to the method of payment, Massari testified:

It would give him a justification for it, and that he would have Michael Williams actually cut me the check so the check wouldn't come from the company, so he would have some plausible deniability in terms of whether the retainer had actually been funded or whatever. He wanted to try to not look like he was hiring a workout specialist.

(Tr. 5–4–99, p.98).

Esposito testified that KFS has no record of having paid this retainer. (Tr. 4–30–99, p.101).

Michael Williams submitted a statement dated June 19, 1997, to KFS in the amount of $25,000 with the following description:

"Retainer—Can be used to pay me or other counsel I retain. You will still pay bills currently." (Trustee's Exhibit 9). KFS issued a check dated July 10, 1997, for $25,000 payable to the order of Michael T. Williams, P.A. which was negotiated by Michael T. Williams, P.A. (Trustee's Exhibit 10). Williams testified:

> I have no recollection of how I came to prepare this invoice. But to the best of my recollection, sometime prior to this invoice, both Mr. Keller and Mr. Massari asked that Mr. Massari be brought in, that a retainer to do that be paid to me, and that I pay that retainer on to Mr. Massari. And it was at their request that I sent this bill.

(Tr. 4–30–99, p.168). Williams had no recollection of why he was asked to do this, (Tr. 4–30–99, p.169), and no recollection of whether he subsequently paid Massari the $25,000. (Tr. 4–30–99, p.170).

Massari testified that he did not receive the $25,000: "Michael Williams got it, and it's my understanding that he had bills outstanding and chose to use that for his bills or made an arrangement with Brian to use it for his bills . . . . I could not find any record of us receiving that $25,000." (Tr. 6–9–99, p.56).

#### 4. The payment to Media Marketing Associates.

On July 9, 1997, KFS received an invoice from Media Marketing Associates in the amount of $50,000 with the following description: "Down Payment for Market Research Package, and Advertising Video Design per Client Specs." (Trustee's Exhibit 11). On July 9, 1997, KFS issued a check in the amount of $50,000 payable to the order of Media Marketing Associates. The check was endorsed by Massari as "Partner" of Media Marketing Associates. (Trustee's Exhibit 12). The check was deposited on July 10, 1997, into the operating account of Massari & Bell, P.A. (Tr. 4–30–99, p.78–79).

Massari testified:

> Media Marketing Associates was, basically, a name that was selected by—actually, it was Brian and Michael to be able to pay me money for the services I had rendered to that point, and Media Marketing Associates was, if you want to say Domenic Massari d/b/a/ Media Marketing Associates, you could say that.

(Tr. 6–9–99, p.61).

> What it was all about was the fact that even Mr. Nixon at this point does not want me to appear to be working for the company in the context of a bankruptcy lawyer, does not want to have a substantial dollar amount appear to go out to a lawyer who is identified with bankruptcy that would suggest to people that there may be a bankruptcy filing. The $50,000 represented one month under my March 5th letter.

(Tr. 6–9–99, p.63).

#### 5. Opinion letters for the bulk sales of loans.

By December, 1996, the companies needed cash for continuing operations. The comptroller testified: "Over the course of that year [1997], we had serious liquidity problems. We did not have enough cash to meet our daily operating needs." (Tr. 4–30–99, p.95).

Six times between December, 1996, and December, 1997, the companies raised cash by selling some of their loans in bulk. The first of these sales was a sale of loans that had been acquired with the proceeds from the equity financing. Williams provided a legal opinion in connection with this sale. (T. 4–30–99, p.173). With respect to the charge for this opinion, Williams testified: "I have no recollection of what I charged, but I think it was $2,500 or $5,000, something like that. I really don't remember though." (Tr. 4–30–99, p.176). Williams was asked to provide an opinion in connection with a second sale of loans, but would not do so because it required a representation concerning insolvency. (T. 4–30–99, p.174).

The companies sold loans in bulk five times further, however. In these five sales, generally, loans subject to the secured notes of the financing affiliates were sold by the financing affiliates to KFS, and KFS sold the loans to third party purchasers. Massari & Bell, P.A. provided the legal opinions in connection with these sales, and was paid an amount equal to one percent of the proceeds of each sale as the fee for each opinion. (Tr. 6–9–99, p.114).

Massari & Bell, P.A. was paid $286,-961.23 between September 23, 1997, and December 31, 1997, for rendering opinions in connection with the five sales of loans in bulk. (Stipulation of Facts, ¶ 3).

### 6. The December 15, 1997, retention letter.

Massari Law Group wrote a letter dated December 15, 1997, to Brian Keller, as president of "Keller Financial Services of Florida, Inc." (Trustee's Exhibit 4). The stated purpose of the letter was to "serve as an express fee agreement between Keller Financial Services of Florida, Inc. and its affiliates and subsidiaries and Massari Law Group," pursuant to a request that Massari Law Group become counsel on a retainer basis.

The letter provides: "You have requested that we become counsel to the companies on a retainer basis, recognizing that ultimately it may be necessary for all or some of the companies to seek relief under Chapter 11 of the Bankruptcy Code." (Trustee's Exhibit 4).

The letter provided for the payment of a retainer in the amount of $1,000,000 upon its execution. The letter also provided that an "additional bankruptcy retention fee" in the amount of $150,000, together with a cost retainer in the amount of $20,-000, would be paid in the event that a chapter 11 petition was filed. Finally, the letter provided that the Respondents would receive any surplus amounts that remained in an employee retention fund as an additional retainer.

The letter further provides: "This retainer fee is deemed paid and the property of Massari Law Group upon payment....We may draw all or any portion of these funds down in our discretion after payment is made."

This letter was signed by Brian Keller as President of "Keller Financial Services of Florida, Inc., and its affiliates and subsidiaries," and his signature is dated December 15, 1997.

The parties stipulated that the Debtors agreed to pay the Respondents "a retainer that ultimately became $1,305,000" pursuant to the December 15, 1997, letter. (Stipulation of Facts, ¶ 6). The Court finds that the amount actually received by Massari & Bell, P.A. pursuant to the letter is $1,305,419. This total amount consists of the following:

1. $1,000,000 received by Massari & Bell, P.A. in December of 1997 at or about the time that the letter was executed. (See Trustee's Exhibit 5, Letter of Direction Regarding Escrowed Funds, and Massari's stipulation that the money was received and disbursed in accordance with the Letter of Direction, Tr. 5–4–99, p.269).

2. $170,000 received in March of 1998. (Trustee's Exhibit 8, check dated March 27, 1998, payable to Massari Law Group in the amount of $170,000). The parties stipulated that this payment constituted an additional retainer. (Stipulation of Facts, ¶ 11).

3. $135,419 received in March of 1998, also characterized as an additional retainer. The source of this payment was an Employee Retention Trust. The Debtors had initially transferred the sum of $3.2 million to Massari & Bell's trust account, and the Employee Retention Trust subsequently was funded by a transfer of $840,000 from Massari & Bell's account to the Employee Retention Trust. The Trust was terminated prior to the filing of the chapter 11 petitions, and Massari & Bell, P.A. received $135,419 of the amount contained

in the Trust. (Trustee's Exhibit 5, Letter of Direction, and Stipulation of Facts, ¶ 10).

### 7. The Letter of Direction.

Brian R. Keller, as Chairman of Keller Financial Services of Florida, Inc., signed a Letter of Direction Regarding Escrowed Funds. His signature is dated December 15, 1997. The letter provided that KFS of Florida would be placing on deposit with Massari Law Group the sum of $3.2 million. "The purpose of these funds is to set aside funds to provide monies for th[e] employment of professionals, employee retention, payment of past due amounts and to fund Keller Financial Services, Inc. for the employment of new management on an advance payment basis." (Trustee's Exhibit 5). Instructions for the disbursement of the funds, and the reasons for such disbursements, were:

1. $475,000 to Massari Law Group. This amount represented the balance of the general retainer of $50,000 per month for the months of March 1997 through December 1997, in accordance with the March 5, 1997, letter, less $25,000 already paid.

2. $1,000,000 to Massari Law Group. This amount represented the retainer to be paid pursuant to the retainer letter dated December 15, 1997.

3. Up to $840,000 to the "Keller Employer [sic] Retention Trust."

4. $250,000 to Price Waterhouse. This amount represented an "additional advance retainer to assist in the restructuring of the companies and providing evaluation of the companies' portfolios."

5. Up to $640,000 to Keller Financial Services, Inc. This amount was for the purpose of securing advance payments to consultants or employees.

The letter further provided that "upon the deposit of these funds, the funds shall be the property of the recipients described above and shall be disbursed at the request and on behalf of the recipients as their separate property, upon request to Massari Law Group."

"From the $3.2 million transferred to Massari's trust account, Massari & Bell, P.A. received $1,475,000 by January 15, 1998." (Stipulation of Facts, ¶ 9).

### 8. Termination of the employee retention fund.

The employee retention fund was initially funded with $840,000 by a deposit into the Massari & Bell P.A. trust account. In early 1998, several employees entered agreements with the company that entitled each such employee to a certain amount if the employee remained with the company under certain conditions.

In March, 1998, the employee retention fund was terminated. The comptroller testified that the employees were instructed to take discounted amounts and sign waivers. (Tr. 4–30–99, p.115).

The excess amount in the fund, approximately $400,000, was divided between John Stanton, Charles Lafasciano, and Massari & Bell, P.A. Massari & Bell, P.A. received $135,419. (T. 4–30–99, p.116; Stipulation of Facts, ¶ 10).

### 9. The March, 1998, invoice.

Massari Law Group submitted an invoice dated March 26, 1998, to the Vice President of "Keller of Florida, Inc. and affiliated entities" in the amount of $203,200.00. The invoice states that it is a "total and summary of the attached detailed billings, for the period set forth therein." (Trustee's Exhibit 7). There are no attachments to the invoice that was stipulated into evidence, however, and the comptroller testified that there were no attachments to the invoice when she received it. (Tr. 4–30–99, p.135).

KFS paid $170,000 to Massari & Bell, P.A. pursuant to this invoice. Massari testified that this payment represented the additional fee retainer ($150,000) and cost retainer ($20,000) referred to in the December 15, 1997, retainer letter. (Tr. 5–

11–99, p.117). Massari testified that the invoice was in a larger amount because he was requesting a cost reimbursement of $3,200 and an additional cost retainer of $30,000. (T. 5–11–99, p.117).

## D. Total payments.

With respect to payments under the March 5, 1997, letter, the parties stipulated prior to trial that "Massari & Bell, P.A. in fact received $550,000 under this agreement, meaning he was overpaid by $50,000." (Stipulation of Facts, ¶ 4). Notwithstanding the pretrial stipulation, the Court finds that Massari & Bell, P.A. actually received the total of $525,000 pursuant to the agreement reflected by the March 5 letter. The total payment consists of (1) $50,000 received in July of 1997 pursuant to the invoice from Media Marketing Associates, and (2) $475,000 received in December of 1997. The Court cannot find that the Respondents received an additional $25,000 which was paid by the Debtors to Michael Williams, but which may never have been forwarded to the Respondents. (Tr. 4–30–99, p.170; Tr. 6–9–99, pp.50–56).

The total amount received by the Massari & Bell, P.A. from July of 1997 through March 31, 1998, was $2,117,380.23:

1. $50,000 by check payable to Media Marketing Associates, and endorsed and deposited by Massari & Bell, P.A. (Trustee's Exhibit 12).

2. $286,961.23 paid to Massari & Bell, P.A. for rendering opinions in connection with the Debtors' bulk loan sales. (Stipulation of Facts, ¶ 3).

3. $1,475,000 paid to Massari & Bell, P.A. from the trust account of Massari & Bell, P.A. (Stipulation of Facts, ¶ 9), in payment of the balance due under the letter dated March 5, 1997, and the $1.0 million retainer provided by the letter dated December 15, 1997.

4. $135,419 paid to Massari & Bell P.A. from the funds remaining after the early termination of the Employee Re-

tention Trust. (Stipulation of Facts, ¶ 10).

5. $170,000 paid to Massari & Bell, P.A. pursuant to the invoice for $203,-200, as an additional retainer. (Stipulation of Facts, ¶ 11).

The parties stipulated that all of these payments were made to Massari & Bell, P.A., and there is no evidence that indicates otherwise.

## E. The Filings.

Keller Financial Services of Florida, Inc. filed a chapter 11 petition on April 1, 1998. The other nine financing affiliates filed chapter 11 petitions on April 2, 1998.

Keller Financial Services, Inc. did not file a petition, and is not a debtor in these proceedings.

## II. Section 329, and Rules 2016 and 2017

Section 329 of the Bankruptcy Code provides:

**11 U.S.C. § 329. Debtor's transactions with attorneys**

(a) Any attorney representing a debtor in a case under this title, or in connection with such a case, whether or not such attorney applies for compensation under this title, shall file with the court a statement of the compensation paid or agreed to be paid, if such payment or agreement was made after one year before the date of the filing of the petition, for services rendered or to be rendered in contemplation of or in connection with the case by such attorney, and the source of such compensation.

(b) If such compensation exceeds the reasonable value of any such services, the court may cancel any such agreement, or order the return of any such payment, to the extent excessive, to—

(1) the estate, if the property transferred—

(A) would have been property of the estate; or

(B) was to be paid by or on behalf of the debtor under a plan under chapter 11, 12, or 13 of this title; or (2) the entity that made such payment.

Rules 2016(b) and 2017(a) of the Federal Rules of Bankruptcy Procedure implement the statutory provisions:

**Rule 2016. Compensation for Services Rendered and Reimbursement of Expenses**

. . . . .

**(b) DISCLOSURE OF COMPENSATION PAID OR PROMISED TO ATTORNEY FOR DEBTOR.** Every attorney for a debtor, whether or not the attorney applies for compensation, shall file and transmit to the United States trustee within 15 days after the order for relief, or at another time as the court may direct, the statement required by § 329 of the Code. . . . A supplemental statement shall be filed and transmitted to the United States trustee within 15 days after any payment or agreement not previously disclosed.

**Rule 2017. Examination of Debtor's Transactions with Debtor's Attorney**

**(a) PAYMENT OR TRANSFER TO ATTORNEY BEFORE ORDER FOR RELIEF.** On motion by any party in interest or on the court's own initiative, the court after notice and a hearing may determine whether any payment of money or any transfer of property by the debtor, made directly or indirectly and in contemplation of the filing of a petition under the Code by or against the debtor or before entry of the order for relief in an involuntary case, to an attorney for services rendered or to be rendered is excessive.

■ Under § 329, the compensation of attorneys employed by debtors to provide services in contemplation of or in connection with bankruptcy is subject to review for reasonableness. See *In re Dixon*, 143 B.R. 671, 675 (Bankr.N.D.Tex.1992).

**A. ". . . in contemplation of or in connection with the case . . ."**

Section 329 authorizes bankruptcy courts to review fees paid to a debtor's attorney within one year prior to the filing of a case to the extent that the fees are for services provided "in contemplation of or in connection with the case."

**1. Interpretation.**

In *Roland v. Unum Life Insurance Company of America*, 223 B.R. 499, 503–04 (E.D.Va.1998), the District Court found that the legal services at issue in that case were "simply too attenuated to the bankruptcy proceeding to create jurisdiction over the matter for the bankruptcy court." In so finding, the District Court relied on the decision of the Fifth Circuit Court of Appeals in *In re Hargis*, 895 F.2d 1025, 1026 (5th Cir.1990) for the rule that "§ 329 does not apply to services rendered that are unrelated to the bankruptcy proceeding, and the bankruptcy court has no jurisdiction to review those fees."

■ The Trustee acknowledges the general rule that § 329 does not authorize the review of compensation for services unrelated to bankruptcy. However, the Trustee argues that all fees paid to Massari & Bell, P.A. were "in contemplation of or in connection with" the filing of the Debtors' petitions, within the meaning of § 329(a) and Rule 2017(a). (Trustee's Post-Trial Brief, p.2).

■ In § 329, the phrase "in contemplation of or in connection with" clearly is written in the disjunctive. Accordingly, attorney's fees are subject to review under § 329 either if the legal services were rendered "in contemplation of" a bankruptcy case, or if the services were rendered "in connection with" a bankruptcy case. The Court agrees with the Court in *In re Rheuban*, 121 B.R. 368 (Bankr.C.D.Cal. 1990) that the two subphrases have different meanings, and that different standards apply with respect to each.

■ First, the subphrase "in contemplation of" denotes a subjective element. Courts may review fees if the underlying services were performed "at a time when the debtor was contemplating bankruptcy. Under this test it does not matter what the nature of the legal services are." *In re Rheuban,* 121 B.R. at 378.

> A subjective and not an objective test applies in determining whether payments to attorneys were made "in contemplation of bankruptcy." The controlling question is the state of mind of the debtor, i.e., *whether, in making the transfer, the debtor is influenced by the possibility or imminence of a bankruptcy proceeding.*

*In re Dixon,* 143 B.R. 671, 676 n.3 (Bankr.N.D.Tex.1992)(Emphasis supplied). See also *In re Creative Restaurant Management, Inc.,* 139 B.R. 902, 918 (Bankr. W.D.Mo.1992).

The Court in *Rheuban* considered Supreme Court authority in reaching its conclusions. In *Conrad, Rubin & Lesser v. Pender,* 289 U.S. 472, 53 S.Ct. 703, 77 L.Ed. 1327 (1933), the Supreme Court examined the phrase "in contemplation of the filing of a petition" as that phrase was used in Section 60d of the Bankruptcy Act to allow a court to review for reasonableness fees paid "in contemplation of the filing of a petition." The Supreme Court made several statements which are appropriate to consider in the evaluation of this case:

> Section 60d, authorizing a reexamination of payments and transfers by the bankrupt for services to be rendered, has a broader scope. It contains no intimation of an intention to limit the jurisdiction to re-examine to a particular sort of legal services for the payment of which the debtor has disposed of his property. *The point of the provision conferring jurisdiction for a summary re-examination is not the specific nature of the legal services to be rendered, but that the payment or transfer to provide for them is made "in contemplation" of bankruptcy....As to the jurisdiction to re-examine, the controlling question is with respect to the state of mind of the debtor and whether the thought of bankruptcy was the impelling cause of the transaction....*If the payment or transfer was thus motivated, it may be re-examined and its reasonableness be determined.

> ... But it is insisted, in the instant case, that the payment to appellants could not properly be regarded as made in contemplation of bankruptcy, and hence within the jurisdiction to re-examine, because the payment was for the purpose of engaging appellants to conduct negotiations with creditors in order to arrange for an extension of time, and if necessary, for the operation of the business under the creditors' supervision, and thus to avoid a forced liquidation and ultimately to restore the business to a sound basis. We find no ground for saying that the fact that such purposes were in view establishes, as matter of law, that the payment was not in contemplation of bankruptcy. On the contrary, *negotiations to prevent bankruptcy may demonstrate that the thought of bankruptcy was the impelling cause of the payment. "A man is usually very much in contemplation of a result which he employs counsel to avoid."* [Citations omitted.]

*Conrad, Rubin & Lesser v. Pender,* 289 U.S. at 476–78, 53 S.Ct. 703 (Emphasis supplied).

■ To assess whether legal services were "in connection with" a bankruptcy case, courts should consider objective factors.

> Thus I conclude that the "in connection with" language used in § 329 extends the scope of the Court's review to compensation paid by the debtor to an attorney any time after one year prior to the commencement of the debtor's bankruptcy case, whether or not the court can make a subjective determination that the debtor was contemplating bank-

ruptcy, *if it can be objectively determined that the services rendered or to be rendered by the attorney have or will have an impact on the bankruptcy case.* In re Rheuban, 121 B.R. at 378 (Emphasis supplied). See also *In re Ostas,* 158 B.R. 312, 321–22 (N.D.N.Y.1993).

For purposes of § 329, the scope of the phrase "in connection with" is broad. *In re Ostas,* 158 B.R. at 321(citing *In re Command Services Corporation,* 85 B.R. 230 (Bankr.N.D.N.Y.1988)). The phrase may include services related to the precipitating cause of the bankruptcy, or services which are inextricably intertwined with the bankruptcy. In *In re Command Services Corporation,* 85 B.R. 230, 232 (Bankr. N.D.N.Y.1988), the Court found that the services of a debtor's attorney who was retained to collect accounts receivable were rendered "in connection with" a bankruptcy proceeding where the debtor's failure to collect on those accounts was the precipitating cause of the debtor's eventual bankruptcy.

In *In re Prudhomme,* 43 F.3d 1000 (5th Cir.1995), the Fifth Circuit Court of Appeals found that a fee was paid "in contemplation of or in connection with" a bankruptcy case where the debtors were in desperate financial condition, where they sought legal counsel in their dispute with their creditors, and where they were unsuccessful in restructuring their debt. The Fifth Circuit Court of Appeals reached this conclusion even though the $50,000 first installment of the retainer was paid approximately one and one-half years before the filing of the bankruptcy petition, and even though the principal lawyer of the firm representing the debtors testified at trial that "he would never have agreed to do a bankruptcy for the Debtors 'a year and a half down the line....'" *In re Prudhomme,* 152 B.R. 91, 100 (Bankr.W.D.La.1993), *aff'd sub nom. Arens v. Boughton,* 176 B.R. 781 (W.D.La. 1993), *aff'd sub nom. In re Prudhomme, Arens v. Boughton,* 43 F.3d 1000 (5th Cir. 1995).

In this case, the Court finds that the Respondents' services were provided both "in contemplation of" and "in connection with" the Debtors' bankruptcy cases.

### 2. The evidence.

The Debtor was experiencing financial difficulties after the third quarter of 1995. (Tr. 4–30–99, p.171). In July of 1996, Michael Williams introduced Brian Keller to Massari for the purpose of discussing bankruptcy issues. (Tr. 4–30–99, pp.170–72). At a meeting on July 3, 1996, Massari and representatives of the Debtors discussed the possibility of a workout and the ramifications of a chapter 11 case. (Tr. 5–4–99, p.65). Massari met with Brian Keller again a few weeks later, on July 23, 1996, "and was asked to prepare a retention letter to assist the company with a workout litigation and, if ultimately necessary, a bankruptcy." (Tr. 5–4–99, p.77). Massari prepared a proposed retention letter. (Trustee's Exhibit 1). The "scope of representation" set forth in the letter includes workout negotiations with lenders and "could include the filing of Chapter 11 proceedings." The letter contains numerous other references to potential bankruptcy proceedings in terms of the fee structure, costs, and billing. The letter was not signed by Brian Keller.

Angela Esposito was employed by Keller Financial Services, Inc. beginning in May of 1996 as the assistant comptroller and subsequently the comptroller. The static pool analyses prepared by Esposito beginning in June of 1996 reflected that the companies had significant delinquencies. (Tr. 4–30–99, p.90). Esposito prepared balance sheets commencing in October of 1996 which reflected that the companies' liabilities exceeded their assets, and that the companies had a negative net worth. (Tr. 4–30–99, p.91). According to Esposito, the Debtors "had serious liquidity problems" from December of 1996 until December of 1997. During that year, according to Esposito, the Debtors did not have enough cash to

meet their daily operating needs. (Tr. 4–30–99, p.95).

Commencing in December of 1996, the Debtors engaged in bulk loan sales. The purpose of the sales was to address the insufficiency of the Debtors' cash to meet their operating needs. (Tr. 4–30–99, p.95). The last sale was conducted in December of 1997. "Those were all driven by a need for cash." (Tr. 4–30–99, p.96).

In early 1997, indemnification and severance trusts were established for officers.

Brian Keller again contacted Massari in March of 1997. (Tr. 5–4–99, p.87). Keller advised Massari that "the companies had sustained much greater losses than they thought," and that "there would be a Chapter 11" if a merger was not successful. (Tr. 5–4–99, p.88). The "company was considering restructuring or bankruptcy possibly as one alternative." (Tr. 5–4–99, p.89).

The March 4, 1997, meeting was confirmed by a letter dated March 5, 1997, written by Massari. (Trustee's Exhibit 2). The March 5 letter states that the Respondents "may investigate the possibility of a Chapter 11 case as part of our analysis," and that a retainer exceeding $1,500,000 may be required in the event that a chapter 11 petition became necessary.

The March 5, 1997, retention letter, and its commitment to a $500,000 liability, was not disclosed because Keller was concerned about the effect that the retention of the Respondents would have. Payment under the letter was to be deferred until December, 1997. Massari was to have "limited interaction with Michael Nixon [the President of the companies] concerning acquisitions, mergers, and the like," and his "overall mission was to remain confidential." If Massari & Bell, P.A. requested any payment prior to December 31, 1997, it would do so "by a separate bill that will not reflect the contents of this letter."

Angela Esposito first learned, apparently informally, that a bankruptcy case was contemplated as early as September of 1996, in a conversation she had with the former controller. (Tr. 4–30–99, p.88). In October of 1997, she "was informed that Domenic Massari was our bankruptcy counsel and that bankruptcy was imminent." (Tr. 4–30–99, p.89).

Massari wrote another retention letter to Brian Keller, as president of Keller Financial Services of Florida, Inc., dated December 15, 1997. (Trustee's Exhibit 4). With respect to the scope of representation, the letter states that "you are asking us to provide all legal services, including bankruptcy services to the Keller companies with the only exclusions being tax and securities law advice." The letter provides for a retainer of $1.0 million, that the retainer is the property of Massari Law Group, that no additional fee would be charged for subsidiaries of Keller Financial Services of Florida, Inc. for the nest year, and that an additional $150,000 would be required to "serve as an additional bankruptcy retention fee" in the event that a chapter 11 case was deemed necessary.

### 3. Application.

■ In view of the evidence, the Court finds that the compensation paid or agreed to be paid by the Debtors to Massari & Bell, P.A. was for services rendered "in contemplation of" bankruptcy.

As of July of 1996, the Debtors were aware that they were in financial distress, and were introduced to Massari as a bankruptcy attorney to explore bankruptcy as an option.

Over the months after the first meeting with Massari, the Debtors recognized financial difficulties. The static pool analyses showed that their loans had significant delinquencies. By October of 1996 the balance sheets showed that liabilities exceeded assets. By late 1996, and during 1997, the Debtors needed to raise additional cash for operations. The Debtors could not raise funds by their earlier methods of public financing, but had to raise these

funds by selling loans. In early 1997, the Debtors established indemnification and severance trusts for officers.

Keller contacted Massari again in March, 1997. The companies had sustained much greater losses than previously believed. Keller was concerned about the financial condition of the companies, and was seeking the legal advice of an experienced business and bankruptcy lawyer.

The agreement reached in March for the legal services of Massari & Bell, P.A. at a cost of $500,000 was so confidential that Keller would not sign the letter, and the contents of the letter were not to be disclosed.

The Court concludes that the payment received by Massari & Bell, P.A. in July of 1997, and all payments received thereafter, were obtained "at a time when the debtor was contemplating bankruptcy." Under this prong of § 329, the nature of the services is immaterial. *In re Rheuban,* 121 B.R. at 378. When the Debtors transferred each increment of the $2,117,380.23 to Massari & Bell, P.A., the Debtors were influenced by the possibility or imminence of a bankruptcy proceeding. *In re Dixon,* 143 B.R. at 676 n.3.

The Court also finds that the compensation paid to Massari & Bell, P.A. was for services rendered or to be rendered "in connection with" a bankruptcy case. It can be objectively determined that the Respondents' services had an impact on the bankruptcy case. *In re Rheuban,* 121 B.R. at 378.

The Debtors knew as early as the summer of 1996 that they were in financial distress. By 1997, the Debtors could no longer obtain working funds through their traditional means. In March of 1997, Keller had further discussions with Massari. The March 5, 1997, letter provided that the Respondents' services were to involve an assessment of the companies' financial information, litigation matters, and merger, acquisition, and sale possibilities, and may also involve an analysis of a chapter

11 case. Massari testified extensively with respect to his work under the March 5 retention letter. (Tr. 5–4–99, pp.98–206 and 211–257).

Massari also testified regarding the opinion letters that he wrote for the bulk loan sales, in exchange for receipt of the sum of $286,961.23. (Tr. 5–4–99, pp.205–11). The Debtor needed cash for its operating costs at the time that the bulk loan sales occurred. (Tr. 4–30–99, pp.95–96). When Brian Keller believed that the Debtors could receive favorable prices for the loans, therefore, he pursued the loan sales as a hoped-for alternative to bankruptcy. (Tr. 5–4–99, pp.205–06). As Massari testified, the loan sales were "necessary to keep these Debtors alive." (Tr. 6–9–99, p.123).

Finally, the compensation received under the December 15, 1997, retention letter is expressly connected to the bankruptcy case. The letter explicitly refers to "an additional bankruptcy retention fee," for example, and the initial $1,000,000 retainer was intended to represent an estimate of the amount that would be required to conclude a bankruptcy case.

All of the work described by Massari for this period was designed, either directly or indirectly, to impact on the bankruptcy case, either by preparing the Debtor for a potential filing, or by seeking a method to avoid the filing. Accordingly, for the purposes of evaluation under § 329, the services were rendered in connection with the bankruptcy cases.

### 4. Exploration of alternatives.

Massari asserts that the services during 1997 and in early 1998 were not rendered in contemplation of or in connection with bankruptcy because they were a variety of legal services, they were services for many tasks other than bankruptcy tasks, the companies' management was considering many alternatives to bankruptcy, the companies' management did not want to file bankruptcy, the management had a stop

and go mentality towards bankruptcy, and the management's intent should be evaluated as it changed from moment to moment. (Massari's Post–Trial Brief, pp.9–10).

The Court acknowledges that during 1997 the companies' management was searching for alternatives to bankruptcy, and that management considered bankruptcy as one of the least preferable methods of addressing the difficulties of the companies.

The alternatives that were being considered, however, were not ways of increasing sales, or eliminating producers with poor performance, or resolving collection problems, or improving the productivity of employees. The alternatives being considered were major business or structural changes, such as merger, consolidation, acquisition, sale, bulk sales of loans, or "such other major transactions." The companies were not struggling to return to profitability, but were considering alternatives which implicitly conceded that the core business of the companies was beyond rehabilitation. The problems faced by the companies were fundamental problems with the companies' earning assets, that is, the poor performance of the loans themselves. The loans were not producing enough income to meet the requirements of the business as it was structured, and the performance of the loans was deteriorating. The basic business of the companies was not able to support the companies, and the only alternatives were major changes in the structure of the companies and their business.

Although the companies had raised funds by public offerings of secured notes 22 times from 1992 through 1995, management of the companies determined that the companies could no longer raise funds in that manner. After one public equity offering in early 1996, management determined that the companies could no longer raise funds in that manner. During 1997, the companies raised needed funds by selling their earning assets.

When other alternatives were unsuccessful and the companies finally filed their bankruptcy petitions on April 1 and 2, 1998, the companies had combined assets of less than $43 million and combined liabilities of more than $156 million. The companies had lost more than $110 million. That loss did not occur in March, 1998, but began much earlier. The losses were being noticed as early as 1995, according to the securities lawyer for the companies. As Brian Keller noted to Massari, by March of 1997 the companies "had sustained much greater losses than they thought." (Tr. 5–4–99, p.88).

Although the bankruptcy petitions were not filed until April, 1998, the Court concludes that all services rendered by Massari and Bell, P.A. during 1997, whether the services related to the exploration of merger, acquisition, or sale possibilities, negotiations with potential lenders, restructuring of financing, analysis of corporate structure, review of potential litigation, review of securities matters, raising of cash through bulk sales of loans, or other of the services, were rendered in contemplation of and in connection with bankruptcy.

> Where the principals in a business are concerned about its viability and that it cannot survive without additional capital, a merger, or a takeover, the rule of Conrad applies, even where there were "negotiations to prevent bankruptcy."

*In re Prudhomme,* 152 B.R. 91, 100 (Bankr.W.D.La.1993), *aff'd sub nom. Arens v. Boughton,* 176 B.R. 781 (W.D.La. 1993), *aff'd sub nom. In re Prudhomme, Arens v. Boughton,* 43 F.3d 1000 (5th Cir. 1995), citing *Matter of J.J. Bradley & Co., Inc.,* 6 B.R. 529 (Bankr.E.D.N.Y.1980).

In view of the law and the evidence, the Court concludes that the entire amount of the compensation paid to Massari & Bell, P.A. in this case ($2,117,380.23) was paid for services rendered or to be rendered "in contemplation of or in connection with" the bankruptcy case.

**B. "... shall file with the court a statement of the compensation paid or agreed to be paid, and the source of such compensation."**

Section 329(a) of the Bankruptcy Code requires an attorney for a debtor to disclose all fee payments and all fee agreements made within one year prior to the filing of the bankruptcy petition, for services provided in contemplation of or in connection with the bankruptcy case.

**1. Interpretation.**

■ The disclosure requirements of § 329 are mandatory, and not merely permissive. *In re Smitty's Truck Stop, Inc.,* 210 B.R. 844, 848 (10th Cir. BAP 1997).

■ The provision recognizes "that a debtor is in a vulnerable position and is highly dependent on its attorney and therefore will be reluctant to object to the fees of the attorney. The purpose of this process is to prevent overreaching by an attorney and provide protection for creditors." *In re Smitty's Truck Stop, Inc.,* 210 B.R. at 848.

> The concern behind § 329 is that the debtor's attorney is not only in a peculiarly advantageous position to overreach, but also that the failing debtor may be tempted "to deal too liberally with his property in employing counsel to protect him in view of financial reverses and probable failure."

*In re Benjamin's–Arnolds, Inc.,* 1997 WL 86463, at *6 (Bankr.D.Minn.1997)(quoting *In re Wood & Henderson,* 210 U.S. 246, 253, 28 S.Ct. 621, 52 L.Ed. 1046 (1908)).

■ A debtor's attorney must "lay bare all its dealings ... regarding compensation.... Counsel's fee revelations must be direct and comprehensive. Coy, or incomplete disclosures ... are not sufficient." *In re Smitty's Truck Stop, Inc.,* 210 B.R. at 848 (quoting *In re Park–Helena Corp.,* 63 F.3d 877, 881 (9th Cir.1995)).

■ The Bankruptcy Appellate Panel of the First Circuit recently explained the strict scrutiny that courts should undertake with respect to the disclosure of a bankruptcy attorney's fee arrangements:

> In order for the bankruptcy court to fairly evaluate applications for employment of professionals, there must be full and complete disclosure of all connections with the debtor.... "[C]oy or incomplete disclosures which leave the court to ferret out pertinent information from other sources are not sufficient." [citation omitted]. *Full and complete disclosure includes, inter alia, a complete disclosure of fee arrangements with the Debtor* so the court can assess conflicts that may give rise to disqualification.

*In re Independent Engineering Co.,* 232 B.R. 529, 531–32 (1st Cir. BAP 1999)(Emphasis supplied). The scrutiny stems from "a bankruptcy court's inherent authority to regulate professional compensation and protect bankruptcy estates." *In re Levin,* 1998 WL 732878 (Bankr.E.D.Pa.).

**2. Nondisclosure of compensation.**

In this case, the Trustee asserts that the Respondents engaged in a pattern of nondisclosure relating to fee payments or fee agreements. The Trustee asserts, for example, that the Respondents failed to disclose (1) the retainer proposal dated July 24, 1996 (Trustee's Exhibit 1); (2) the retainer proposal dated March 5, 1997 (Trustee's Exhibit 2); (3) the retainer agreement dated June 11, 1997 (Trustee's Exhibit 3); (4) the $50,000 payment in July of 1997 made through Media Marketing Associates; (5) the $286,961.23 received for providing the opinion letters for the bulk loan sales; (6) the receipt of $170,000, pursuant to an invoice for $203,200, shortly before the filing of the petitions; and (7) the total amount of $2,142,380.23 received prior to the filing of the chapter 11 petitions. (Trustee's Post–Trial Brief, pp.5–11).

The record shows that the Respondents disclosed the receipt of certain fees in this

case, although such disclosure was not filed timely. Rule 2016 provides that the disclosure shall be filed within 15 days after the order for relief. In these cases, the dates of the orders for relief are April 1 and 2, 1998. The Disclosure of Compensation of Attorney for Debtor in each of the ten chapter 11 cases was filed on May 14, 1998.

In the case of Keller Financial Services of Florida, Inc., Case No. 98–5299–8G1, the Respondents stated in the Disclosure:

1. Pursuant to 11 U.S.C. Section 329 and Bankruptcy Rule 2026(b) [sic], I certify that I am the attorney or [sic] the above-mentioned debtor(s) and that *compensation paid to me within one year before the filing of the petition in bankruptcy, or agreed to be paid to me, for services rendered or to be rendered on behalf of the Debtor(s) in contemplation of or in connection with the bankruptcy case is as follows:*

For legal services, I have agreed to accept contractual payments from the Debtor's parent company, which were not specifically allocated among subsidiaries such as this Debtor.

*Prior to the filing of this statement I have received for this case and nine other related Chapter 11 cases Eight Hundred Sixty Seven Thousand Dollars.* Specific payments per contract and allocation of the contractual amounts paid in contemplation and in connection with this case, based on estimates of time and complexity in connection with this case and the eight other subsidiary cases would allocate Three Hundred Thousand Dollars ($300,000.00) of the fees to be paid on behalf of this case.

2. The source of compensation paid to me was Keller Financial Services of Florida, Inc., the Debtor's parent company.

(Emphasis supplied). The Disclosures in the other nine cases stated that $63,000 of the total amount received ($867,000) was allocated to each of those cases. The Disclosures were signed by Massari.

On June 1, 1998, the Debtors filed an Application to Employ Attorneys for Debtor–in–Possession under General Retainer. On the same date, an Affidavit of Domenic L. Massari, III was filed. In the Affidavit, Massari states that his firm had represented the Debtor since approximately March of 1997, initially in connection with a possible workout or restructuring of the Debtors' financial affairs without the need for a bankruptcy case. Massari also acknowledges that he "authored opinion letters at the request of the debtor entities" with respect to certain loan sale transactions. Finally, Massari states in the Affidavit that "[n]o attorney in the firm has been paid fees prepetition or holds a security interest, guarantee or other assurance of compensation for services performed and to be performed in the case, or in connection herewith, except by Keller Financial Services of Florida, Inc. as disclosed in Debtor's schedules and the Bankruptcy Rule 2016 statement." Copies of each of the Disclosures of Compensation were attached to the Affidavit.

No supplemental affidavit or disclosure was filed.

Consequently, the Respondents disclosed pursuant to § 329 and Rule 2016 that Massari & Bell, P.A. received fees in the total amount of $867,000 for services rendered or to be rendered in contemplation of or in connection with the bankruptcy cases.

As set forth above, Massari & Bell, P.A. actually received payments aggregating $2,117,380.23 between July of 1997 and March 31, 1998. Clearly, the Respondents did not disclose all of the fees received from the Debtors in the one year period prior to the filing of the chapter 11 petitions.

Massari & Bell, P.A. contends that it complied with the disclosure requirements of § 329, since under that provision it was only required to disclose fees paid "in con-

templation of or in connection with" the bankruptcy cases. Massari testified that he interprets § 329 as requiring disclosure of only the "bankruptcy retainer," meaning a retainer received for bankruptcy services to be provided from the date of filing to the date of confirmation.

Massari contends that the bankruptcy retainer received under the retention letter dated December 15, 1997, was $750,000. This figure does not appear in the December 15 letter. Massari then contends that he separated the prepetition services that were "related to" the bankruptcy cases from the services that were not related to bankruptcy. According to his calculation, the fee for the services "related to" bankruptcy amounted to $117,000. Massari therefore claims that he added this figure to the retainer of $750,000 to arrive at the sum of $867,000 disclosed on his Statement of Compensation. (Tr. 5–11–99, p.90).

The Bankruptcy Court recently considered an argument similar to the Respondents' in *In re Woodward*, 229 B.R. 468 (Bankr.N.D.Okla.1999), and concluded that the debtor's attorney violated the disclosure requirement of § 329. In that case, the attorney contended that he was not required to disclose prepetition fees in excess of a certain amount because "the work performed by Todd was not sufficiently related to the bankruptcy filing to warrant disclosure." *In re Woodward*, 229 B.R. at 474. The Court rejected the argument:

> Were the Court to require less than full disclosure, the purpose behind § 329(a) would be defeated. Counsel could avoid disclosure of any or all of the fees paid to them by making a covert decision that the undisclosed fee was so unrelated to the bankruptcy case that its disclosure was not required, and eliminating the possibility of Court review in the process. The Court's ability to make a meaningful review of attorney's fees would be hindered if not destroyed.

*Id.* at 475. The Court found that the prepetition work performed by the attorney was both "in contemplation of" and "in connection with" the bankruptcy case. *Id.* at 474.

█ In this case, the Respondents did not disclose the full amount of the fees received by Massari & Bell, P.A. in the year preceding the filing of the chapter 11 petitions ($2,117,380.23 received minus $867,000 disclosed equals $1,250,380.23 not disclosed). As explained, the Respondents did not even disclose the full amount of the retainer received pursuant to the letter agreement dated December 15, 1997. As concluded above, the entire amount of the payments to Massari & Bell, P.A. after one year before the dates of filing the petitions was for services rendered in contemplation of or in connection with the bankruptcy cases. Accordingly, the failure to disclose the total amount of the payments constitutes a violation of § 329(a) of the Bankruptcy Code.

Moreover, the sources of compensation were not disclosed. In addition to receiving payments from KFS and the financing affiliates, Massari & Bell, P.A. received payments of (a) $135,419 at the termination of the employee retention fund, from funds which had become "the property of the recipients" as described in the Letter of Direction, (b) $286,961.32 at the closing of the sales of loans by KFS, which loans KFS had purchased from the financing affiliates, and (c) $50,000 by or through Media Marketing Associates.

### 3. Sanction for nondisclosure.

There are no measurable damages which result from the non-disclosure of compensation required by § 329.

█ It is generally held that an attorney may be ordered to disgorge a retainer received prepetition as a sanction for his failure to disclose the payments under § 329. "Courts have long recognized that failure to disclose is a sufficient basis for disqualification or disgorgement." *In re*

*Independent Engineering Co.*, 232 B.R. at 532. "The law is clear that the failure to properly disclose compensation received is in and of itself grounds for disgorgement." *In re Woodward*, 229 B.R. at 475. In *In re Prudhomme*, 43 F.3d 1000, 1003 (5th Cir.1995), the Court found a "pattern of nondisclosure," and held that the concealment constituted misconduct justifying disgorgement. The failure to make timely disclosure of fees as required by § 329 is an "independent and alternative basis" for ordering a debtor's attorney to disgorge fees. *In re Dixon*, 143 B.R. 671, 680 (Bankr.N.D.Tex.1992) and *In re Rheuban*, 121 B.R. 368, 385 (Bankr.C.D.Cal.1990).

Although bankruptcy courts generally have some discretion in fashioning sanctions, "[i]n cases involving an attorney's failure to disclose his fee arrangement under § 329 or Rule 2016, however, the courts have consistently denied all fees." *In re Downs*, 103 F.3d 472, 478 (6th Cir.1996). The Court may exercise its discretion and deny or reduce fees for counsel's failure to disclose its fee arrangements, whether or not actual harm accrues to the estate. *In re Central Florida Metal Fabrication, Inc.*, 207 B.R. 742, 749 (Bankr.N.D.Fla.1997)...."The disclosure requirements impose upon attorneys an independent responsibility. Thus, failure to comply with the disclosure rules is a sanctionable violation, even if proper disclosure would have shown that the attorney had not actually violated any Bankruptcy Code provision or any Bankruptcy Rule." *In re Woodfield Gardens Associates*, 1998 WL 276453 (Bankr.N.D.Ill.) (Citations omitted).

"The fact that the failure to properly disclose may have been the result of negligence or inadvertence does not 'vitiate the failure to disclose.'" *In re Woodward*, 229 B.R. at 473 (citing *In re Park–Helena*, 63 F.3d at 881). With respect to inadequate disclosures, "no exceptions are to be made based upon inadvertency, slipshoddiness or good faith." *In re Century Plaza Associates*, 154 B.R. 349, 352 (Bankr.S.D.Fla.1992)(quoting *In re Kero–Sun*, 58 B.R. 770, 780 (Bankr.D.Conn. 1986)).

The failure to make full disclosure in this case, however, was not due to inadvertence. The amount of the compensation that was not disclosed is significant, and was not simply overlooked. Instead, Massari made a purposeful calculation of the amount that he chose to include on the Disclosure of Compensation, as described in his testimony. However, "[a]nything less than the full measure of disclosure leaves counsel at risk that all compensation may be denied." *In re Woodward*, 229 B.R. at 474.

The nondisclosure of more than $1 million in fees is aggravated by the additional failure to disclose the complex transactional history between the Respondents and the Debtors and the sources of the compensation. Consequently, "[w]e are not faced with a simple 'technical breach' of § 329 and Rule 2016 here." *In re Downs*, 103 F.3d at 479. Instead, the Respondents "acted affirmatively" in the failure to disclose the complete relationship with the Debtors. *Id.* See also *In re Independent Engineering Co.*, 232 B.R. 529, 532 (1st Cir. BAP 1999)(a "pattern of less than candid disclosure" warranted disgorgement).

One alternative for the Court to consider is to evaluate all services rendered by Massari & Bell, P.A., authorize Massari & Bell, P.A. to retain the reasonable fee, and require disgorgement of the balance. This alternative would not result in any consequence for the failure to disclose the amounts received, however, because this is the process that would have been followed at the request of any party in interest if the amounts had been disclosed.

Another alternative for the Court to consider is to require disgorgement of all amounts received, a total of $2,117,380.23. This sanction is unduly severe, and would not compensate Massari & Bell, P.A. for any of its work, although Massari spent

months working a substantial amount of time for the companies.

The appropriate sanction in this case, as suggested by the cases described, is the disgorgement of the amount received by Massari & Bell, P.A. pursuant to the December 15, 1997, retention letter. This amount was intended to serve as the bankruptcy retainer. The purpose of the payment is evidenced in part by the December 15 retention letter itself:

> You have requested that we become counsel to the companies on a retainer basis, *recognizing that ultimately it may be necessary for all or some of the companies to seek relief under Chapter 11* of the Bankruptcy Code.
>
> ... In effect, you are asking us to provide all legal services, *including bankruptcy services* to the Keller companies with the only exclusions being tax and securities law advice.

(Trustee's Exhibit 4)(Emphasis supplied). Additionally, Massari's testimony verifies that the total amount paid under the December 15 letter agreement is intended to represent the Respondents' chapter 11 retainer. Massari testified that he initially had wanted "a million-and-a-half dollars for a bankruptcy retainer," but that when the agreement was prepared, the $1,000,-000 "was what Brian [Keller] and I talked about in terms of my bankruptcy retainer." (Tr. 5–4–99, pp.258–60). The amounts of $170,000 and $135,419 also received by Massari & Bell, P.A. were characterized as additional retainer amounts. (Trustee's Exhibit 5; Stipulation of Facts ¶¶ 10, 11).

In short, the entire $1,305,419 received by Massari & Bell, P.A. under the December 15, 1997, retention letter constituted the bankruptcy retainer. Violation of § 329 of the Bankruptcy Code warrants disgorgement of the entire amount of the bankruptcy retainer. *In re Downs*, 103 F.3d at 480–81 ("In summary, we find that Friedman violated § 329 and Rule 2016. We further find that the bankruptcy court erred by refusing to compel Friedman and Mapother to disgorge their retainer in

toto."); *In re Smitty's Truck Stop, Inc.*, 210 B.R. 844, 851 (10th Cir. BAP 1997)("The Appellant completely failed to comply with the disclosure requirements of §§ 327 and 329 and Rules 2014(a) and 2016(b).... As a result, the Bankruptcy Court ordered disgorgement of the retainer and denial of all fees. In this it did not abuse its discretion."); *In re Woodward*, 229 B.R. 468, 475 (Bankr.N.D.Okla. 1999)("The law is clear that the failure to properly disclose compensation received is in and of itself grounds for disgorgement.... The fact that the fee may or may not have been reasonable or have been earned does not justify a disregard for the rules of disclosure.").

Massari & Bell, P.A. should be required to return the sum of $1,305,419 to the estate as a sanction for failing to disclose all compensation paid or agreed to be paid within one year prior to the filing of the chapter 11 petitions, and the sources of such compensation, in violation of § 329 of the Bankruptcy Code and Rule 2016 of the Federal Rules of Bankruptcy Procedure.

**C. "... exceeds the reasonable value of any such services ... "**

Section 329(b) provides that if "such compensation exceeds the reasonable value of any such services," the Court may order the return of any payment to the extent that it is excessive.

As discussed, the entire amount of the fees received by Massari & Bell, P.A. represented compensation for services rendered or to be rendered "in contemplation of or in connection with" the Debtors' bankruptcy cases. Accordingly, the entire amount of the fees are subject to review under § 329 of the Bankruptcy Code.

The Court has concluded that Massari & Bell, P.A. must disgorge the entire amount of the bankruptcy retainer that it received under the December 15, 1997, agreement ($1,305,419) as a sanction for the violation of § 329(a) of the Bankruptcy Code, and no fees should be approved under that

agreement. The compensation remaining for review under § 329, therefore, consists of (1) the $525,000 received pursuant to the March 5, 1997, retention letter, and (2) the $286,961.23 received for rendering opinions in connection with the Debtors' bulk loan sales.

"Section 329 and Bankruptcy Rule 2017(a) provide no guidance to courts in fashioning a test for determining the reasonableness of compensation." *In re Rheuban*, 121 B.R. 368, 383 (Bankr. C.D.Cal.1990). Since there is no statutory guidance, it appears appropriate to look to standards applied by courts in determining the amount of professional compensation that may be awarded under § 330. *In re Rheuban*, 121 B.R. at 383. Factors to consider include (1) the time spent on the services; (2) the rates charged for the services; (3) the complexity, importance, and nature of the tasks; and (4) the compensation charged by comparably skilled practitioners. 11 U.S.C. § 330(a)(3).

### 1. Reasonable value of services pursuant to the March 5, 1997, letter.

The March 5, 1997, retention letter provided that Massari & Bell, P.A. was to receive "by no later than December 31, 1997, a sum representing $50,000 per month from March through December, 1997 for the services described herein." (Trustee's Exhibit 2). In July, 1997, Massari & Bell, P.A. received a payment of $50,000 made to Media Marketing Associates, which Massari testified "represented one month under my March 5th letter." (Tr. 6–9–99, p.63). In December, 1997, Massari & Bell, P.A. received an additional $475,000 for services pursuant to the March 5, 19997, letter.

The parties stipulated that the billing records of Massari & Bell, P.A. show that its professionals recorded 1241.60 hours devoted to the representation during the period beginning March 6, 1997, and ending December 31, 1997. (Stipulation of Facts, ¶¶ 18–22).

Paul Singerman, an attorney specializing in commercial transactions, out-of-court workouts, and bankruptcy, testified as an expert witness with respect to the fees involved in this case. In evaluating an appropriate fee to be charged in the case, Mr. Singerman testified that his assessment included two components. First, Mr. Singerman testified that an appropriate hourly rate for Massari in the Tampa Bay market would range from $240 to $275 per hour. (Tr. 4–30–99, p.193). Second, Mr. Singerman considered the rate that Massari apparently agreed to charge the Debtors for the representation as set forth in a retention letter dated June 11, 1997. (Tr. 4–30–99, pp.193–94; Trustee's Exhibit 3). That letter agreement states:

The attorneys and legal assistants working on your file will be billed as follows:

| | |
|---|---|
| Domenic L. Massari, III, Esquire | $250.00 per hour |
| Caryl E. Delano, Esquire | $200.00 per hour |
| William Duncan, Legal Asst. | $ 75.00 per hour |

(Trustee's Exhibit 3). The retention letter was signed by both Massari and Brian Keller, although Massari contends that it was never effectuated.

Mr. Singerman testified that he considered this rate of $250 per hour to be a reasonable rate for Massari's services.

Michael G. Williamson, an attorney who has specialized in bankruptcy law since the early 1980's, also testified as an expert with respect to the representation of chapter 11 debtors and the fees charged by debtors' counsel. Mr. Williamson had been asked to provide an opinion only as to a reasonable rate for the services rendered under the retention letter dated December 15, 1997, and not as to the services rendered from March to December of 1997. Nevertheless, Mr. Williamson testified that the range of hourly rates for "top-end" bankruptcy attorneys in the Tampa market was between $265 and $280. (Tr. 5–3–99, p.189). Mr. Williamson further testified that he had concluded that a reasonable rate for this case (under the December 15 retention letter) was between $275 and $285 per hour. (Tr. 5–3–99, p.180).

The Court determines that a reasonable rate for the services provided by Massari under the March 5, 1997, retention letter is $260 per hour. The Court further determines that a reasonable rate for the services of Caryl E. Delano is $200 per hour, and that a reasonable rate for the services of William F. Duncan, a legal assistant employed by Massari & Bell, P.A., is $75 per hour, the rates set forth in the June 11, 1997 retention letter.

No expert testified that the $525,000 was a reasonable fee for the services rendered by Massari & Bell, P.A. from March, 1997, through December, 1997. Additionally, no expert testified that the lodestar amount determined by multiplying the hourly rate by the hours expended should be increased or decreased for any reason.

■ Accordingly, the Court concludes that a reasonable fee for the services provided under the March 5, 1997, agreement may be calculated by multiplying the number of hours worked times the hourly rate. As set forth above, the parties stipulated that Massari & Bell, P.A.'s billing records reflect that "its professionals recorded 1,241.60 hours rendering services to the Debtors beginning on March 6, 1997, through December 31, 1997." (Stipulation of Facts, ¶ 21). The Statement for that period was admitted into evidence as the Trustee's Exhibit 15. Based on the statement, the lodestar amount is computed as follows:

| | | |
|---|---|---|
| Massari | 1,049.8 hours × $260 per hour = | $272,948.00 |
| Delano | 6.5 hours × $200 per hour = | 1,300.00 |
| Duncan | 185.3 hours × $ 75 per hour = | 13,897.50 |
| Total | | $288,145.50 |

The Court finds that the amount of $288,-145.50 is a reasonable fee for the services provided by Massari & Bell, P.A. pursuant to the retention agreement dated March 5, 1997.

**2. Reasonable value of services for opinion letters.**

■ Massari & Bell, P.A. received a total of $286,961.23 "for rendering opinions in connection with the Debtors' bulk loan sales." (Stipulation of Facts, ¶ 3). The compensation was established at one percent of the total amount of the sales. This compensation agreement was made by Nixon, although at the time neither Massari nor Brian Keller had disclosed to Nixon the information that Brian Keller had agreed that the companies would pay Massari & Bell, P.A. $50,000 per month for 10 months of 1997. (Tr. 5–4–99, p.206–07).

Mr. Singerman testified that a fee of approximately $287,000 was excessive for providing the five opinion letters at issue in this case. According to Mr. Singerman, if the attorney providing such an opinion is the attorney for a party to the transaction, the attorney would typically charge the client on an hourly basis. (Tr. 4–30–99, p.208). Given the transaction and rates involved in this case, Mr. Singerman stated that the services could "easily" result in fees ranging from $2,500 to $5,000 for each opinion. (Tr. 4–30–99, p.209). Alternatively, Mr. Singerman testified that he is aware of firms that specialize in providing similar opinions, and that one of those firms charged $5,000 per opinion in early 1997, and $7,500 per opinion later in 1997. (Tr. 4–30–99, p.208).

Mr. Williamson, the expert retained by Massari, did not express an opinion regarding the fees which Massari charged, or an opinion regarding an amount that might be reasonable.

Michael Williams, the Debtors' attorney, had provided one opinion for the Debtors prior to the opinions given by Massari. Although Mr. Williams did not recall the amount charged for that opinion, he thought it was approximately $2,500 to $5,000. (Tr. 4–30–99, p.176). Mr. Williams also testified that he felt that a risk was involved in rendering the subsequent opinions, since he did not believe the transaction worked, and that "no amount of money would have made me feel comfortable with that risk." (Tr. 4–30–99, pp.176–77).

No evidence was entered in the record with respect to the time spent by Massari

& Bell, P.A. in providing the five opinions. Massari testified, however, that he returned from out of state in September of 1997 in response to an urgent telephone call from Brian Keller, and prepared the first opinion shortly after his return. (Tr. 5-4-99, pp.210-11). On September 29, 1997, David E. Love, identified as Vice President of Keller Financial Services, Inc., sent Massari a sample "Form of Seller Opinion of Counsel" reflecting the Advanta Auto Finance letterhead. (Trustee's Exhibit 20). The message attached to the Form requested Massari to complete the opinion and return it to Mr. Love as soon as possible.

The language contained in the opinions provided by Massari is virtually identical to the Form supplied by Mr. Love. (Trustee's Exhibits 13, 14, and 17).

The Court concludes that a reasonable fee for providing the opinions is $7,500 for each opinion, for a total fee in the amount of $37,500 ($7,500 × 5 = $35,000).

### 3. Total reasonable value.

The Court concludes that the reasonable value of the services rendered by the Respondents in contemplation of or in connection with the case from March 6, 1997, through December 31, 1997, is $325,645.50. This consists of a reasonable fee in the amount of $288,145.50 for services provided from March 6, 1997, to December 31, 1997, under the retention letter dated March 5, 1997, plus an aggregate amount of $37,500 for the five opinion letters provided between September and December of 1997.

### III. Section 327, and Rule 2014

The Respondents contend that Massari & Bell, P.A. should retain the amount of the reasonable value of its services for the period from January 1, 1998, through May 31, 1998. This amount would be retained from the advance payment retainer of $1,305,419 that was paid to Massari & Bell, P.A. pursuant to the letter dated December 15, 1997. However, as described

above, the entire retainer must be returned to the Debtors as a sanction for the failure to disclose the compensation paid in contemplation of or in connection with the bankruptcy. Additionally, there are other impediments to an award of compensation for the services after January 1, 1998.

 Section 327(a) of the Bankruptcy Code provides:

### 11 USC § 327. Employment of professional persons

(a) Except as otherwise provided in this section, the trustee, with the court's approval, may employ one or more attorneys, accountants, appraisers, auctioneers, or other professional persons, that do not hold or represent an interest adverse to the estate, and that are disinterested persons, to represent or assist the trustee in carrying out the trustee's duties under this title.

The section authorizes the employment of attorneys only to the extent that the attorneys are "disinterested," as defined in § 101(14) of the Bankruptcy Code, and do not hold or represent an interest adverse to the estate. *In re Smitty's Truck Stop, Inc.*, 210 B.R. at 850.

 Rule 2014(a) of the Federal Rules of Bankruptcy Procedure provides in part:

### Rule 2014. Employment of Professional Persons

(a) **APPLICATION FOR AN ORDER OF EMPLOYMENT.** An order approving the employment of attorneys, accountants, appraisers, auctioneers, agents, or other professionals pursuant to § 327, § 1103, or § 1104 of the Code shall be made only on application of the trustee or committee....The application shall be accompanied by a verified statement of the person to be employed setting forth the person's connections with the debtor, creditors, any other party in interest, their respective attorneys and accountants, the United States trustee,

or any person employed in the office of the United States trustee.

This rule requires an attorney seeking approval of his employment to disclose all of his connections with the debtor, creditors, or parties in interest. The purpose of the rule is to permit the Court to make an independent determination of any issue concerning whether the attorney is disinterested. *In re Florence Tanners, Inc.,* 209 B.R. 439, 445 (Bankr.E.D.Mich.1997).

## A. "... with the court's approval ..."

The Chapter 11 petitions commencing these cases were filed on April 1 and April 2, 1998.

On June 1, 1998, two months after the petitions were filed, the Debtors filed an Application to Employ Attorneys for Debtor–in–Possession under General Retainer. In the Application, the Debtors requested authority to employ the Massari Law Group as their attorney in the bankruptcy cases.

Two Objections to the Application were filed. One Objection was filed by the United States Trustee, and one Objection was filed by the Committee of Noteholders. Both Objections were based in large part on the assertion that the Respondents were not disinterested as required by § 327 of the Bankruptcy Code.

A hearing on the Application and Objections was set for June 29, 1998. At that hearing, the Court was advised that Massari was ill, and that his health did not permit him to continue the representation.

On July 2, 1998, an Order was entered on the Application, which deferred ruling on the Application and the Objections. The Order provided that the disposition of the Application was deferred subject to further order of the court. No further order disposing of the Application has been entered.

■ It is consistently held that an attorney is not entitled to any compensation for postpetition services if the employment was not approved by the Court.

Court approval of the employment of counsel for a debtor in possession is the sine qua non to counsel getting paid. Failure to obtain court approval of a professional in accordance with § 327 and Rule 2014 precludes the payment of fees.

*In re Monument Auto Detail, Inc.,* 226 B.R. 219, 224 (9th Cir. BAP 1998)(quoting *In re Weibel, Inc.,* 176 B.R. 209, 211 (9th Cir. BAP 1994)).

Failure to obtain timely court approval of employment is a sufficient basis for denying compensation, regardless of the value of services rendered.

*In re W.T. Mayfield Sons Trucking Co., Inc.,* 225 B.R. 818, 824 (Bankr.N.D.Ga. 1998).

■ The rule is reinforced by § 330 of the Bankruptcy Code, entitled "Compensation of officers." Subsection (a) of § 330 provides that the court may award compensation to "a professional person employed under section 327." The provision does not authorize the court to approve compensation from the estate to a professional not approved by the court under § 327. *In re W.T. Mayfield Sons Trucking Co., Inc.,* 225 B.R. at 824.

Further, the rule can be traced to pre-Code law:

Without an order of court upon full presentation of the relation of the proposed attorney with all other interests involved, not only may he not be retained, but he can recover nothing, no matter how beneficial, or how arduous, his services.

*In re Eureka Upholstering Co., Inc.,* 48 F.2d 95 (2d Cir.1931)(J. Hand)(quoted in *In re W.T. Mayfield Sons Trucking Co., Inc.,* 225 B.R. at 824).

■ In this case, the Respondents contend that they filed an Application for Employment, that the Application has never been disapproved, and that it remains pending and should be approved nunc pro tunc. This Court agrees with the Court in

*In re Monument Auto Detail, Inc., supra,* however, that unresolved issues concerning the attorney's disinterestedness prevent the approval of the application retroactively.

> The court … conducted numerous show cause hearings concerning disinterestedness and nondisclosure of material facts, including the Firm's dual representation of Monument and Monument's principals; and expressed concerns about potential payments that the Firm might have received. Most of these issues were unresolved when the Firm withdrew its employment application. Therefore, the Firm's argument regarding retroactive employment authorization is both speculative and irrelevant.

*In re Monument Auto Detail, Inc.,* 226 B.R. at 226.

The Court concludes that the Respondents are not entitled to an award of compensation for their postpetition services because their employment was never approved by the Court as required by § 327 of the Bankruptcy Code.

**B. "… that do not hold or represent an interest adverse to the estate, and that are disinterested persons …"**

Section 327 permits the employment of attorneys who "do not hold or represent an interest adverse to the estate, and that are disinterested persons."

**1. Interpretation.**

Section 327 "provides a two-prong test. First, the debtor's attorney must not hold or represent an interest adverse to the bankruptcy estate. Second, the debtor's attorney must be a disinterested person." *In re Angelika Films 57th Inc.,* 227 B.R. 29, 37 (Bankr.S.D.N.Y.1998). If either prong of the test is not satisfied, "a professional person is automatically disqualified from representing the estate." *In re Benjamin's–Arnolds, Inc.,* 1997 WL 86463, *4 (Bankr.D.Minn.).

Although the phrase "interest adverse to the estate" is not defined in the Bankruptcy Code, it is generally found that a person holds or represents such an interest if he possesses an "economic interest that would tend to lessen the value of the bankruptcy estate or that would create either an actual or potential dispute in which the estate is a rival claimant … or … a predisposition under the circumstances that render such a bias against the estate." *In re Prince,* 40 F.3d 356, 361 (11th Cir.1994) (citations omitted).

The phrase "disinterested person," however, is defined in the Bankruptcy Code. Section 101(14) provides in part:

**11 USC § 101. Definitions**

. . . . .

(14) "disinterested person" means person that—

(A) is not a creditor, an equity security holder, or an insider;

. . . . .

(E) does not have an interest materially adverse to the interest of the estate or of any class of creditors or equity security holders, by reason of any direct or indirect relationship to, connection with, or interest in, the debtor or an investment banker specified in subparagraph (B) or (C) of this paragraph, or for any other reason.

Subsection (E) of § 101(14) is "broad enough to exclude an attorney with some interest or relationship that 'would even faintly color the independence and impartial attitude required by the Code and the Rules.'" *In re Benjamin's–Arnolds, Inc.,* 1997 WL 86463, at *4 (quoting *In re BH & P, Inc.,* 949 F.2d 1300, 1309 (3rd Cir. 1991)). "'The purpose of § 327 is to prevent even the appearance of a conflict of interest, irrespective of the integrity of the person or firm under consideration.'" *Id.* (quoting *In re Nat'l Distributors Warehouse Co. Inc.,* 148 B.R. 558, 561 (Bankr. E.D.Ark.1992)).

■ Section 328(c) sets forth a remedy in the event that either prong of the test under § 327 is not satisfied at any time during the attorney's employment.

**11 USC § 328. Limitation on compensation of professional persons**

. . . . .

(c) Except as provided in section 327(c), 327(e), or 1107(b) of this title, the court may deny allowance of compensation for services and reimbursement of expenses of a professional person employed under section 327 or 1103 of this title if, at any time during such professional person's employment under section 327 or 1103 of this title, such professional person is not a disinterested person, or represents or holds an interest adverse to the interest of the estate with respect to the matter on which such professional person is employed.

Under § 328(c), a court is authorized, but not required, to deny compensation if an adverse interest appears.

■ The Eleventh Circuit Court of Appeals has accepted the opinion of the Tenth Circuit, however, that "[i]n exercising the discretion granted by the statute we think the [bankruptcy] court should lean strongly toward denial of fees, and if the past benefit to the wrongdoer fiduciary can be quantified, to require disgorgement of compensation previously paid that fiduciary even before the conflict arose." *In re Prince*, 40 F.3d at 360 (quoting *Gray v. English*, 30 F.3d 1319, 1324 (10th Cir. 1994)).

**2. Assertions.**

In this case, the Trustee contends that the Respondents are disqualified from representing the Debtors pursuant to § 327(a) for three primary reasons.

First, the Trustee asserts that the Respondents acted as general counsel for the Debtors prepetition as documented by the retention letters dated March 5, 1997, June 11, 1997, and December 15, 1997.

According to the Trustee, serving as general counsel "suggests a lack of the disinterestedness required for retention" as bankruptcy counsel. (Trustee's Post–Trial Brief, p.9).

Section 1107(b) of the Bankruptcy Code provides:

**11 USC § 1107. Rights, powers, and duties of debtor in possession**

. . . . .

(b) Notwithstanding section 327(a) of this title, a person is not disqualified for employment under section 327 of this title by a debtor in possession solely because of such person's employment by or representation of the debtor before the commencement of the case.

Consequently, the Respondents contend that they are not disqualified from employment as the Debtors' attorney because of their prepetition representation under the clear language of § 1107.

Second, the Trustee asserts that the Respondents held an interest adverse to a class of creditors of the Debtors by virtue of the contents of the retention letter dated December 15, 1997, which provided that:

The only additional fee payment that may be received by Massari Law Group will be in the event that any surplus funds remain from retention proceeds which are or will be set aside for employees. To the extent such funds are not used, they shall be paid as additional retainer to Massari Law Group.

The Keller Employee Retention Trust was established as an inducement for the Debtors' employees to stay with the companies while they reorganized, and to provide the employees with assurances that they would be paid. (Tr. 4–30–99, p.113). The money in the Trust was then to be disbursed to the employees in accordance with individual Employee Retention Letters. (Trustee's Exhibit 5).

According to the Trustee, the provision in the December 15, 1997, letter created a

situation whereby it was in the Respondents' economic interest to ensure that the most money possible was placed into the Employee Retention Trust, and that the least money possible was actually paid to the employees from the fund. The Trustee contends, therefore, that the provision caused the Respondents to hold an interest adverse to the Debtors' employees, and also to the Debtors' Noteholders and preferred stockholders. (Trustee's Post–Trial Brief, pp.9–10).

The Respondents reply that (1) the Employee Retention Trust was terminated prior to the filing of the chapter 11 petitions, so that no adverse interest existed on the date that the petitions were filed, (2) the Respondents were not involved in the decision to terminate the Trust, and (3) the employees actually worked for KFS, Inc., a nondebtor. (Massari's Post–Trial Brief, p.20).

The evidence shows that the Employee Retention Trust was terminated in March of 1998, within one month prior to the filing of the chapter 11 petitions, that the employees accepted discounted payments, and that Massari & Bell. P.A. in fact received the sum of $135,419 from the Trust in March of 1998. (Tr. 4–30–99, p.115, Stipulation of Facts, ¶ 10). The petitions were filed on April 1 and 2, 1998.

Finally, the Trustee contends that the Respondents represented Brian Keller, John Stanton, and Charles Lafasciano individually, and that the representation created an interest adverse to the estate because the individuals were insiders of the Debtors. The Trustee contends that the Respondents are judicially estopped from denying the representation based on pleadings filed in the United States District Court. Specifically, on April 28, 1999, the Massari Law Group filed a document entitled "Emergency Motion to Stay Disclosure of Privileged Materials" in the District Court. (Trustee's Exhibit 22). Attached as Exhibit 1 to the Emergency Motion is a copy of a letter from Massari Law Group's attorneys to the United States Attorney's Office. On page 2 of the letter, Massari Law Group's attorney states:

> The next group of documents are copies of correspondence between Mr. Massari and Messrs. Keller, Stanton, Lafasciano, and others. This set of documents relates to the time frame June 19, 1998 and after, i.e., the date Mr. Massari withdrew as counsel for the Keller entities. These documents are attorney client and work product privilege as they relate to Mr. Massari's representation of these individuals.

On May 3, 1999, the District Court entered an Order on the Emergency Motion to Stay Disclosure of Privileged Materials. The Order provided in part that "[t]hose documents reflecting correspondence between Mr. Massari and Messrs. Keller, Stanton, and Lafasciano dated subsequent to the date that Mr. Massari withdrew as counsel from the Keller's [sic] entities, shall not be disclosed at present." (Trustee's Exhibit 23).

Although the statements in the letter attached to the District Court pleading pertain only to the period following June 19, 1998, the Trustee appears to assert that the Respondents had actually commenced the representation of the individuals prior to the filing of the bankruptcy cases. The Trustee contends, for example, that the Respondents' loyalty to the individuals at the expense of the estate manifested itself in at least three instances.

First, the "surplus" in the Employee Retention Trust, or the amount remaining after payment to the employees, was divided equally among Massari, Stanton, and Lafasciano, with each receiving the sum of $135,419. (Tr. 5–3–99, pp.119–20). This division occurred even though the December 15, 1997, retention letter only states that the Respondents would receive any unused portion of the Trust.

Second, in February of 1998 Massari suggested to Stanton and Lafasciano that they buy Brian Keller's stock in the Debt-

or companies for $100,000. (Tr. 5–4–99, p.319). Stanton testified that he had initially paid Brian Keller $50,000 for 26 percent of his stock, and that he subsequently paid Brian Keller an additional $60,000 for his remaining shares. (Tr. 5–3–99, p.98). The Trustee contends that the stock sale "effectively funneled $100,000 of funds taken from the Debtors into Brian Keller's pocket, at the cost of $100,000,000 in net operating loss carryforwards." (Trustee's Post–Trial Brief, p.11). It appears that the funds used to purchase the stock may in fact have originated from the Debtors, since Keller Financial Services, Inc. had entered into separate agreements with Stanton's company, Octofoil Group, Inc., and with Lafasciano's company, Scarab Management Consultants, Ltd. (Trustee's Exhibits 32 and 33). Pursuant to these agreements, Stanton's company and Lafasciano's company were each to receive a minimum of $300,000 in exchange for services as crisis managers.

Third, shortly before the filing of the Chapter 11 petitions, the sum of $250,000 was transferred from Keller Financial Services of West Florida, Inc., a Debtor, to a certificate of deposit in the name of Keller Financial Services, Inc. The certificate of deposit was used to secure or guarantee a letter of credit for the benefit of a company owned and controlled by Brian Keller. (Tr. 5–3–99, pp.69–70).

### 3. Conclusion.

The Court cannot conclude based on the evidence that the Respondents held a direct economic interest that tended to lessen the value of the bankruptcy estate or that created a dispute in which the estate was a rival claimant. *In re Prince,* 40 F.3d at 361. Consequently, the Court cannot conclude that the Respondents held an "interest adverse to the estate" within the meaning of § 327 of the Bankruptcy Code.

■ The Court finds, however, that the multiple transactions and relationships between the Respondents and insiders of the Debtors, and also between the Respondents and related nondebtor companies, caused the Respondents to possess an interest that colored the independence and impartial attitude required by the Bankruptcy Code. *In re Benjamin's–Arnolds, Inc.,* 1997 WL 86463, at \*4. The Court concludes, therefore, that the Respondents were not disinterested within the meaning of § 327 of the Bankruptcy Code.

In this case, there were close relationships between the attorney and insiders with many conflicting interests. Although Massari states that he did not represent the insiders, the relationships between Massari and the insiders were so close, and the actions of the insiders were, at times, in such conflict with the interests of the financing affiliates, that the court can only conclude that Massari could not have the independence and impartial attitude required by the Bankruptcy Code.

Several factors lead to this conclusion. One of these factors is, of course, the termination of the employee retention fund and the disposition of the excess funds. The employee retention fund was established in January, 1998, to provide incentives for employees to remain with the company through reorganization. Approximately $840,000 was transferred to the fund. (Stipulation of Facts, ¶ 10). These funds became the property of the employees, and were to be disbursed in accordance with agreements reached with employees. (Trustee's Exhibit 5, Letter of Direction). However, in March, 1998, the employees who had entered the agreements were instructed to take payouts of lesser amounts, and to sign waivers. (Tr. 4–30–99, p.115). According to the comptroller of the companies, these instructions to the employees were given by Massari, Lafaciano, Stanton, and Brian Keller. (Tr. 4–30–99, p.115). After the employees had accepted lesser amounts from the fund, there was a surplus of approximately $400,000. These excess funds were not returned to the companies, however, (Tr. 4–30–99, p.115), nor were they paid to Massari & Bell, P.A. as an additional re-

tainer as provided in the December 15, 1997, retention letter agreement. The funds were divided equally among Stanton, Lafaciano, and Massari & Bell, P.A. (Tr. 5–3–99, p.120; Stipulation of Facts, ¶ 10).

Another example of the relationship between Massari and insiders is the undisclosed, unbooked $500,000 liability evidenced by the March 5, 1997, letter. By this agreement, Brian Keller obligated the companies to a $500,000 liability to Massari & Bell, P.A. Under generally accepted accounting principles, the liability should have been booked in March, 1997. (Tr. 4–30–99, p.94–95). Brian Keller and Massari agreed that they would not disclose this liability to the companies, however.

When Massari sought a partial payment under the March 5, 1997, agreement, he and Brian Keller made two arrangements. First, Massari and Brian Keller signed an engagement letter that provided for a $25,000 retainer, which "did not represent the retention" and was designed so that the $500,000 retainer agreement would not be disclosed. Second, Massari sent an invoice to the companies from Media Marketing Associates for $50,000. Media Marketing Associates was a fictitious name selected so the companies could pay Massari for some of the services he had rendered to that point. (Tr. 6–9–99, p.61). The invoice was also designed so that the $500,000 retainer agreement would not be disclosed.

The agreement for the 1% fee for the opinion letters accompanying the bulk loan sales was reached with Nixon at a time when neither Massari nor Brian Keller had disclosed to Nixon that Brian Keller had agreed to pay $500,000 to Massari & Bell, P.A. pursuant to the March 5, 1997, letter. (Tr. 5–4–99, pp.206–07).

In addition to Massari's special relationship with insiders, Massari also possessed a unique relationship with related nondebtor companies. It is apparent that little or no attention was given to any distinctions between KFS and the financing affiliates in the initial periods of the representation.

For example, (1) the retention letters of July, 1996, March, 1997, and June, 1997, each referenced "Keller Financial Services, Inc.;" (2) the letters of July, 1996, and June, 1997, stated that they were to serve as agreements with "Keller Financial Services, Inc. and its affiliates and subsidiaries;" (3) the March 5, 1997, letter which provides an agreement for services for "Keller Financial Services of Florida, Inc. and its subsidiaries" is addressed to Brian Keller at "Keller Financial Services, Inc.;" and (4) the December 15, 1997, letter, which is addressed to Brian Keller at "Keller Financial Services of Florida, Inc." provides an agreement for services for "Keller Financial Services of Florida, Inc. and its affiliates and subsidiaries."

The distinction between KFS and the financing affiliates became important with the bulk sales of the loans. In five of the sales, KFS acquired loans from the financing affiliates in exchange for promissory notes, KFS sold the loans, and KFS then paid the financing affiliates for the loans. Apparently, one of the reasons that the transactions were structured in that manner was that KFS was not insolvent. (Tr. 6–9–99, p.91). However, in addition to paying 1% of the amount of the sales to Massari & Bell, P.A. as a fee for its opinion, KFS retained a 1% fee from these transactions. Whereas in the past KFS had allocated its expenses among the financing affiliates for which it performed services, this was the first time KFS had shown a profit. (Tr. 4–30–99, p.99). Massari testified that "[t]he purpose of this was to assist KFS in having a base to go out and obtain other servicing contracts" (Tr. 6–9–99, p.90), and that KFS retained the fee so that it would "have money to be able to go out and try to find other contracts, market Repo Man, and do things that would ultimately benefit these Debtors." (Tr. 6–9–99, p.122–23). Massari testified:

We made it its money because there was an administrative fee charged for doing those transactions and so that that mon-

ey would be available when they were going out and doing things, marketing, doing things beyond what they had been doing in the past.

(Tr. 6–9–99, p.124).

The independence of KFS was necessary for KFS to survive the demise of the financing affiliates. Massari testified that this independence was intended to benefit the financing affiliates as well as KFS. However, this independence also placed KFS in a position of conflict with the financing affiliates, since the profits of KFS came at the expense of the financing affiliates. Massari represented both KFS and the financing affiliates in these sales.

In early 1998, Massari suggested that Stanton and LaFaciano buy Brian Keller's interest in KFS.

Also in early 1998, Massari prepared a servicing agreement between the financing affiliates and KFS. The servicing agreement provided for a fixed cost to be paid by the financing affiliates to KFS for servicing the loans. This, too, was a departure from the former practice of allocating the expenses of KFS among the financing affiliates. Further, the agreement provided that if the servicing costs were less than the fee paid to KFS, two-thirds of the savings would go to Stanton and Lafasciano, and one-third to the financing affiliates. (Tr. 5–3–98, p.113). Since the financing affiliates and KFS were controlled by Stanton and Lafasciano, the individuals clearly had the ability as well as the interest to ensure that the servicing costs were less than the fee paid to KFS.

Even if, as Massari testified, Massari did not represent Stanton and Brian Keller while he was representing the financing affiliates, the relationships between Massari and Stanton, and between Massari and Brian Keller, were so close that Massari began representing them immediately after he discontinued representing the Debtors. As mentioned, Massari & Bell P.A. indicated at a hearing on June 29, 1998, that Massari's health did not permit him to continue the representation. In later discovery, Massari claimed as protected from discovery a fax dated July 14, 1998, to Addressees/Recipients "Domenic Massari/John Stanton" on the basis of "Attorney Client: AAXCEL/John Stanton." (See Trustee's Exhibit 19). Massari also claimed as protected from discovery a fax dated July 20, 1998, to Addressees/Recipients "Brian Keller/Domenic Massari" on the basis of "Attorney Client: Brian Keller/Debtors." (Trustee's Exhibit 19).

As discussed, the Respondents' employment was never approved by the Court. Even if the Respondents' employment had been approved under § 327, however, the claim for compensation for postpetition services should be denied pursuant to § 328(c) of the Bankruptcy Code, since the Respondents are not disinterested persons as defined in § 101(14).

**C. "... a verified statement ... setting forth the person's connections ..."**

As set forth above, Rule 2014 of the Federal Rules of Bankruptcy Procedure provides that an application for an order of employment shall state all of the person's connections with the debtor, creditors, and any other party in interest, and that the application must be accompanied by a verified statement setting forth the person's connections with the debtor, creditors, and any other party in interest.

**1. Interpretation.**

 The Rule requires disclosure of all of the person's connections with the debtor and other parties in interest. "The scope of disclosure is much broader than the question of disqualification.... The applicant and the professional must disclose all connections and not merely those that rise to the level of conflicts." *In re Granite Partners, L.P.*, 219 B.R. 22, 35 (Bankr.S.D.N.Y.1998). The professional must disclose all facts that bear on his disinterestedness, and cannot usurp the court's function by unilaterally choosing which connections impact on his disinterestedness and which do not. Even

arguable conflicts must be disclosed. *In re Granite Partners, L.P.*, 219 B.R. at 35.

> These disclosure requirements are not discretionary. The duty of professionals is to disclose all connections with the debtor, debtor-in-possession, insiders, creditors, and parties in interest as well as fee arrangements. *They cannot pick and choose which connections are irrelevant or trivial.*
>
> . . . . .
>
> Violation of the disclosure rules alone is enough to disqualify a professional and deny compensation, regardless of whether the undisclosed connections or fee arrangements were materially adverse to the interests of the estate or were de minimis.

*In re EWC, Inc.*, 138 B.R. 276, 279 (Bankr.W.D.Okla.1992)(Emphasis supplied). See also *In re Smitty's Truck Stop, Inc.*, 210 B.R. 844, 850 (10th Cir. BAP 1997).

▓▓▓ Further, the duty to disclose is a continuing duty that survives the initial filing of the application for employment, and continues even after a professional's employment is approved. *In re Diamond Mortgage Corp.*, 135 B.R. 78, 90 (Bankr. N.D.Ill.1990).

> Rule 2014(a) does not expressly require supplemental or continuing disclosure.... Nevertheless, section 327(a) implies a duty of continuing disclosure, and requires professionals to reveal connections that arise after their retention.... Continuing disclosure is necessary to preserve the integrity of the bankruptcy system by ensuring that the trustee's professionals remain conflict free.

*In re Granite Partners, L.P.*, 219 B.R. at 35. "[A] professional employed under 11 U.S.C. § 327(a) is under a continuing obligation to supplement its 2014 statement if circumstances change." *In re Olsen Industries, Inc.*, 222 B.R. 49, 59 (Bankr. D.Del.1997).

▓▓▓ Finally, the remedy for a professional person's violation of the continuing duty to disclose may be denial of the professional's compensation. "Failure to disclose connections that have the potential for creating a conflict warrants a denial of all compensation to debtor's counsel." *In re Smitty's Truck Stop, Inc.*, 210 B.R. at 850. See also *In re Olsen Industries, Inc.*, 222 B.R. at 61, in which the Bankruptcy Court noted that the debtor had cited many cases, such as *In re Hot Tin Roof, Inc.*, 205 B.R. 1000 (1st Cir. BAP 1997), for the proposition that a disclosure violation warrants denial of a pending fee application.

## 2. The disclosure.

In this case, the Affidavit of Domenic L. Massari, III, contains the following disclosures regarding his connections with the Debtors:

> 5. My firm has represented the Debtor since approximately March of 1997. This representation was initially in connection with a possible workout or restructuring of the Debtor's financial affairs without the need for a reorganization proceeding.
>
> . . . . .
>
> 14. No attorney in the firm represents an insider of the Debtor. The undersigned does not and has not represented John Stanton, Charles Lafasciano, Octofoil Corp., Inc., Scarab Management Consultants, Ltd., Keller Financial Services, Inc., (except on behalf of the Debtors in the limited capacity described below), KFS Group, Inc., or any company other than the related Debtors listed on Exhibit "A" hereto. In connection with certain loan sale transactions by the Debtor and the related entities listed on Exhibit "A," in which Keller Financial Services, Inc. was requested to act as an agent for the various Debtors and as a conduit to effectuate the loan sale, the undersigned authored opinion letters at the request of the Debtor

entities which recognized (for the specific purpose of these rules) that the seller of the loans of [sic] Keller Financial Services, Inc. However, in these transactions, at all times, the Debtors were the beneficial sellers and real parties in interest.

(Trustee's Exhibit 6). The Respondents did not make any additional or supplemental disclosures.

### 3. Nondisclosure of connections with insiders.

■ The Court finds that the Respondents did not adequately disclose all of their connections with the Debtors, creditors, or other parties in interest, and did not disclose all facts which bear on the Respondents' disinterestedness. *In re Granite Partners, L.P.*, 219 B.R. at 35. Significant connections between the Respondents and the Debtors, creditors, and parties in interest appear in this case which should have been disclosed.

Principally, the Respondents should have disclosed the nature of their relationship to the individual insiders of the Debtors, Brian Keller, John Stanton, and Charles Lafasciano. In his Affidavit, Massari expressly states that no attorney in the firm represents an insider of the Debtors, specifically including Stanton and Lafasciano. Regardless of whether an attorney-client relationship was formed, however, the evidence reveals that a relationship or connection clearly existed between the Respondents and Keller, Stanton, and Lafasciano that warranted disclosure.

As early as July 25, 1996, shortly after Massari had been introduced to Brian Keller, Massari "suggested that Trusts be set up into which the severance pay amount would be deposited for the 5 members of Keller Financial Service senior management. In addition, a separate trust to fund litigation costs would be set up for the benefit of KFS senior management and me." (Trustee's Exhibit 21, Memorandum from Michael T. Williams to Joe

Williams). "Senior management" at the time that the suggestion was made included Brian Keller. (Tr. 6–9–99, p.19).

The March 5, 1997, retention letter, addressed to Brian Keller, states that Massari was to have "limited interaction" with Michael Nixon, who was the chief executive officer of the Debtor at the time, and further stated that "my overall mission is to remain confidential and to prepare for you, as Chairman, certain analysis and to be available on an 'as needed' basis." (Trustee's Exhibit 2).

The extent to which Massari's mission remained confidential is significant. Massari and Brian Keller intended for the existence of the retention letter to be kept in secrecy, presumably known only by Massari and Keller. The agreement was not signed by Brian Keller. When asked why Brian Keller did not sign the agreement, Massari testified that Keller "did not want to have to acknowledge having signed a retainer agreement or a letter of this type with anybody. He wanted to be able to honestly say to people that he didn't have any such arrangement." (Tr. 5–4–99, p.96). Massari further testified that "the representation of Keller Financial Services of Florida, Incorporated, was supposed to be kept secret per instructions from Brian Keller," (Tr. 6–9–99, p.28), and that "[n]one of the other directors other than Brian Keller, none of the officers, and none of the employees were to know about" the retention letter. (Tr. 6–9–99, p.31).

Further, as set forth above, the letter provided for the payment to Massari & Bell, P.A. of $50,000 per month from March through December, 1997, or $500,000, by no later than December 31, 1997. The comptroller for Keller Financial Services, Inc., however, testified that she had not been aware of the agreement until the time of trial, that the corporate records do not reflect the existence of the agreement, and that the amount due was not booked as a liability, as would have been required

by generally accepted accounting principles. (Tr. 4–30–99, pp.94–95).

A retention letter dated June 11, 1997, was signed by Brian Keller. (Trustee's Exhibit 3). The June 11 letter, however, was never intended to constitute an effective employment agreement. (Tr. 6–9–99, p.52). Massari testified that Brian Keller requested that he prepare the letter solely to justify a payment under the March 5 agreement, which remained secret. Massari further testified that "this is a document off a word processor with the scope of representation changed for the purpose of obtaining a payment under the March 5th letter, so it was not intended to be anything more than what the client requested for me to get a payment. The March 5th deal was the deal." (Tr. 6–9–99, p.59). It appears, therefore, that Brian Keller and Massari agreed to a sham arrangement for the benefit of Massari, the intent of which was not revealed to other corporate officers.

For the same reason as the June 11, 1997, retention letter, that is, to obtain payment from the financing affiliated to Massari & Bell, P.A. without disclosing the representation, Massari submitted an invoice in the amount of $50,000 from Media Marketing Associates, and Keller Financial Services, Inc. paid $50,000 to Media Marketing Associates that was deposited into the account of Massari & Bell, P.A.

Nixon reached the agreement to pay 1% of the bulk loan sales to Massari & Bell, P.A. for the loan sale opinions without knowing about the agreement to pay $500,000 to Massari & Bell. P.A. (Tr. 5–4–99, pp.206–07).

Massari recommended John Stanton to Brian Keller as a crisis manager. (Tr. 5–3–99, pp.74–75). Massari had known Stanton from prior business dealings. Massari also introduced Charles Lafasciano to the Debtor companies based on prior business associations. (Tr. 5–4–99, p.302).

Stanton is the president of Octofoil Group, Inc. On January 22, 1998, an Agreement was entered between Octofoil Group, Inc. and Keller Financial Services, Inc. whereby Octofoil was to provide crisis management services and was to be paid the nonrefundable amount of $150,000 upon the execution of the agreement, an additional $150,000 on the earlier of June 1, 1998, or five days before the filing of a chapter 11 case, and a "success bonus" in the amount of $300,000 on the occurrence of certain events. Massari witnessed the signatures of John Stanton and Brian Keller on the agreement. (Trustee's Exhibit 32).

Nine days later, on January 31, 1998, a Pre–Formation Agreement was signed by Brian Keller, John Stanton, and Charles Lafasciano. (Trustee's Exhibit 29). Pursuant to this document, the three individuals agreed to form a corporation known as KFS Group, Inc. The stated purpose of the corporation was to provide consulting and managerial services to Keller Financial Services, Inc. and Keller Financial Services of Florida, Inc. Massari witnessed the signature of John Stanton on the document.

On the same date, January 31, 1998, the newly-formed KFS Group, Inc. and Keller Financial Services, Inc. entered into an agreement whereby KFS Group, Inc. was to provide business planning and crisis management services to Keller Financial Services, Inc., and the company was to pay KFS Group, Inc. a total sum of $300,000 upon execution of the agreement, and additional monthly payments commencing in April of 1998. (Trustee's Exhibit 31). Massari witnessed the signatures of Stanton, Lafasciano, and Brian Keller on the document.

Lafasciano is the president of Scarab Management Consultants, Ltd. On February 5, 1998, five days after the execution of the agreement with KFS Group, Inc., Scarab and Keller Financial Services, Inc. entered an agreement whereby Scarab was to provide crisis management services to Keller Financial Services, Inc., and Keller Financial Services, Inc. was to pay

Scarab the nonrefundable sum of $150,000 upon execution of the agreement, an additional $150,000 on the earlier of June 1, 1998, or five days prior to the filing of a chapter 11 case, and a bonus upon the occurrence of certain events. (Trustee's Exhibit 33). Massari witnessed the signatures of Lafasciano and Brian Keller on the document.

As discussed above, the "surplus" in the employee retention fund, or the amount remaining after payment to the employees, was divided equally among Stanton, Lafasciano, and Massari & Bell, P.A. with each receiving approximately $135,000. (Tr. 5–3–99, pp.119–20). This division occurred even though the December 15, 1997, retention letter provided only that Massari & Bell, P.A. would receive the unused portion of the Trust, and no writing has been submitted which entitles Stanton and Lafasciano to any distribution from the Trust. The distribution was made within one month prior to the filing of the bankruptcy petitions.

On April 16, 1999, the Respondents' attorney, Todd Foster, wrote a letter to the assistant United States attorney regarding the disclosure of certain of the Respondents' documents. On page 2 of the letter, Mr. Foster wrote:

> The next group of documents are *copies of correspondence between Mr. Massari and Messrs. Keller, Stanton, Lafasciano, and others.* This set of documents relates to the time frame June 19, 1998 and after, i.e., the date Mr. Massari withdrew as counsel for the Keller entities. *These documents are attorney client and work product privilege as they relate to Mr. Massari's representation of these individuals.*

(Trustee's Exhibit 18)(Emphasis supplied). Additionally, on April 28, 1999, the Respondents' attorney provided a privilege log to the Trustee. (Trustee's Exhibit 19). The privilege log includes entries for materials for which the "Legal Basis for Claim" is "Attorney Client: Brian Keller," "Attorney Client: Brian Keller and Credit Pro-

tection Corporation," and "Attorney Client: AAXCEL/John Stanton."

The evidence does not establish that the Respondents represented Brian Keller, John Stanton, or Charles Lafasciano as their attorney prior to or during the time that the Respondents represented the Debtors. The evidence does indicate, however, that the Respondents shared a relationship with the three individuals that was not typical of an ordinary relationship between an attorney for a debtor and the insiders of the debtor. It appears in this case that Massari and Brian Keller had a relationship of particular trust and confidence that resulted in secret agreements and deceptive payments to Massari & Bell, P.A. It further appears that Massari brought Stanton and Lafasciano to the Debtors, with a special interest in making the arrangement financially rewarding for them. In either case, an appearance of partiality and divided loyalty exists which clearly should have been disclosed. The Court concludes that the Respondents' relationship with Brian Keller, John Stanton, and Charles Lafasciano constituted a "connection" with the individual insiders that warranted disclosure. The extent of the relationship with KFS also should have been disclosed.

### 3. Sanction for nondisclosure.

█ The Seventh Circuit Court of Appeals recently discussed the gravity of the requirement under Rule 2014 that an attorney disclose any "connections with the debtor, creditors, [and] any other party in interest."

The disclosure requirements apply to all professionals and are not discretionary. The professionals 'cannot pick and choose which connections are irrelevant or trivial.' *In re EWC, Inc.,* 138 B.R. 276, 280 (Bankr.W.D.Okl.1992). '[C]ounsel who fail to disclose timely and completely their connections proceed at their own risk because failure to disclose is sufficient grounds 'to revoke an employment order and deny compensa-

tion.' . . . . [T]his procedure is designed to ensure that a 'disinterested person' is chosen to represent the debtor. This requirement goes to the heart of the integrity of the administration of the bankruptcy estate. The Code reflects Congress' concern that any person who might possess or assert an interest or have a predisposition that would reduce the value of the estate or delay its administration ought not have a professional relationship with the estate. [Citation omitted].

*United States v. Gellene,* 182 F.3d 578, 588 (7th Cir.1999).

Courts generally agree that an attorney is subject to sanctions if he fails to properly disclose any connections under Rule 2014.

When an attorney fails to disclose an adverse interest, the Court is required to deny fees in toto. [Citation omitted]. Even where no adverse interest has been found, some courts find that denial of fees is mandatory where an attorney has failed to meet disclosure requirements. [Citation omitted].

This Court finds, however, that where no adverse interest is discovered, a court, reviewing an application for attorney's fees after representation has been completed, is not required to deny fees in toto for an attorney's failure to meet the disclosure requirements. . . . The most analogous section is 11 U.S.C. § 328(a), which provides the Court with discretion to alter conditions of employment, including compensation conditions, 'after the conclusion of employment, if such terms and conditions prove to have been improvident in light of developments not capable of being anticipated at the time of the fixing such terms and conditions.'

*In re National Liquidators, Inc.,* 182 B.R. 186, 196–97 (S.D.Ohio 1995). Similarly, the Bankruptcy Court in *In re Granite Partners, L.P.,* 219 B.R. 22, 40–41 (Bankr. S.D.N.Y.1998) found:

[T]he failure to make proper disclosure may itself warrant disqualification and partial or complete denial of compensation . . . .

At a minimum, failure to disclose is an exacerbating factor warranting the reduction or denial of fees for lack of disinterestedness. . . . Regardless of the precise application, willful or intentional failure to disclose merits the harshest sanctions. . . .

 It is generally accepted that denial of all compensation for postpetition services is the appropriate sanction where a failure to disclose has been found. "Failure to disclose connections that have the potential for creating a conflict warrants a denial of all compensation to debtor's counsel." *In re Smitty's Truck Stop, Inc.,* 210 B.R. at 850.

Pursuant to the well-established statutory and case law, the failure to disclose all connections with the Debtor and the failure to disclose all payments received from the Debtor warrant a denial of all fees and disgorgement of any prepetition retainer. . . . Since the Debtor's attorney failed to disclose his prepetition connections with the Debtor and/or Heit either at the time of filing his application for employment or in any fee application or in his statement required under § 329, denial of compensation is the appropriate remedy.

*In re Maui 14K, Ltd.,* 133 B.R. 657, 660–61 (Bankr.D.Hawai'i 1991).

Further, some Courts have determined that it is appropriate in certain circumstances not only to disallow the attorney's compensation for postpetition services upon finding a failure to disclose, but also to require that the attorney return any fees received for prepetition services. In *In re Love,* 163 B.R. 164, 170–71 (Bankr. D.Mont.1993), for example, the Court found that it had "the discretion to disqualify Applicant, deny all fees, and order disgorgement of the pre-petition fees." According to the Court in *Love,* factors weighing in favor of complete disgorge-

ment include the fact that the failure to disclose all "connections" was coupled with the attorney's failure to disclose certain prepetition payments, the fact that the attorney was an experienced bankruptcy practitioner familiar with the duty of disclosure, and the fact that the attorney took certain positions in the case that may have been influenced by the undisclosed connection. *In re Love,* 163 B.R. at 171. See also *In re Occidental Financial Group, Inc.,* 40 F.3d 1059, 1063 (9th Cir.1994)("Halperin's undisclosed conflict of interest and failure to disclose his representation of the Deckers deprived him of any equitable claim to a retention of the fees for prepetition services.")

 In this case, as in *Love,* the Respondents failed to disclose payments received in the year prior to the filing of the chapter 11 petitions. The amount of the payments not disclosed was the significant amount of $1,250,380.23. Additionally, Massari is an experienced bankruptcy practitioner familiar with the rules regarding disclosure. Finally, it appears that Massari may have taken certain positions or actions that were influenced by his relationship with Brian Keller, John Stanton, and Charles Lafasciano, such as the division of the surplus funds in the Employee Retention Trust among Massari, Stanton, and Lafasciano, and the agreement with Brian Keller to conceal retention agreements from the Debtor companies.

Under these circumstances, the Court concludes that the Respondents' failure to disclose their relationship with the individual insiders of the Debtors warrants disgorgement of the Chapter 11 retainer received by the Respondents in the amount of $1,305,419, and denial of all fees claimed pursuant to the retention letter dated December 15, 1997.

## IV. Sections 328 and 329, and the Nature of Retainers

The December 15, 1997, retention letter states that a retainer in the amount of $1,000,000 will be paid to the Respondents, and further provides:

This will be for services after the date hereof. This retainer fee is deemed paid and the property of Massari Law Group upon payment. Massari Law Group agrees, that with the exception of additional retainers described subsequently herein, that no further sums will be sought to be paid by Keller or its affiliates for services rendered over the next one year period. However, at the end of one year, we will review the status of our account and if any additional payments are due, based on hourly billing, they will be waived by our firm. However, in the event billing by our firm does not equal the amount of the retainer fee, then in that event we will continue to provide services at no cost until the retainer is exhausted. We may draw all or any portion of these funds down in our discretion after payment is made.

(Trustee's Exhibit 4).

According to the Trustee, Massari "apparently claims" that the retainer constitutes an "earned on receipt" or "advance payment" retainer. (Trustee's Post–Trial Brief, p.22). The Trustee asserts, however, that such a retainer is property of the estate within the meaning of § 541 of the Bankruptcy Code, notwithstanding its characterization, and that the retainer is subject to review under § 329 and to the reasonableness requirement under § 328. In support of his assertions, the Trustee relies on *In re Bressman,* 214 B.R. 131 (Bankr.D.N.J.1997) and *In re NBI, Inc.,* 129 B.R. 212 (Bankr.D.Colo.1991).

The Respondents, in their Trial Memorandum filed prior to the final evidentiary hearing, listed a contested legal issue as "whether the Bankruptcy Code permits the taking of an advance payment retainer prepetition." (Respondents' Trial Memorandum filed April 26, 1999, p.6). In their Post–Trial Brief, however, the Respondents do not appear to contend that the Court has no power to direct the disgorgement or reduction of the retainer by virtue

of its status as property of the Respondents, as opposed to property of the estate. Instead, the Respondents state in their Brief that "[p]repaid or classic or advance fee retainers (as distinct from security retainers) are permitted under Florida law. Though the retainer becomes property of the attorney, it is still subject to review for excessiveness, whether in or outside of bankruptcy." (Respondents' Post–Trial Brief, p.12 n.11).

The Court agrees that prepaid retainers are allowed under Florida law, and that a prepetition retainer is subject to court scrutiny to determine its reasonableness. The Court further finds that such scrutiny is appropriate regardless of whether the retainer is characterized as an "advance payment" retainer, an "earned on receipt" retainer, a "security" retainer, or any other type of retainer.

The Committee on Professional Ethics of The Florida Bar has commented on retainers and the requirement to maintain retainers in trust accounts. Opinion Number 93–2 describes different types of retainers in Florida:

1. True retainer:

A retainer, in the sense in which it was probably used originally, was the fee a client paid a lawyer in return for the lawyer's agreement to accept employment from the client and thus not accept employment from adverse parties, whether paid with or without reference to any specific legal services. (Citations omitted). Its payment has no relation to the obligation of the client to pay his attorney for services which he has retained him to perform. (Citation omitted). The "true retainer" is therefore earned upon receipt and should not be deposited in the trust account.

2. Prepaid fee—nonrefundable (or earned on receipt retainer, or advance payment retainer):

A prepaid fee which the attorney and client have expressly agreed is nonre-fundable is likewise earned upon receipt and so should not be held in trust but should be deposited into the attorney's general account. *Nevertheless, the lawyer may later be obligated to refund part, or possibly all of it, if the legal services are not performed, in which case the fee may be found to be excessive,* but the money is the lawyer's upon receipt of it. (Emphasis supplied).

3. Prepaid fee—deposit (or prepaid security retainer):

On the other hand, the prepaid fee may be given to the attorney with the understanding that it is a deposit securing a fee that is yet to be earned. Such money does not belong to the lawyer, and should be held in trust until it has been earned by performance of the agreed-upon services. The Committee believes that there should exist a presumption that prepaid fees are an advance deposit against fees for work that is yet to be performed. Certainly, this is the assumption that the typical client would make. The attorney should bear the burden of rebutting this presumption.

Fl. Eth. Op. 93–2, October 1, 1993, 1993 WL 761327. The Committee on Professional Ethics noted that "[I]n today's practice ... the term 'retainer' is used in a variety of ways—often as a synonym for fee." *Id.*

The retainer paid to Massari & Bell pursuant to the December 15, 1997, retainer letter was not a true retainer, and was not a prepaid security retainer, but was a prepaid fee which the parties agreed was nonrefundable. This type of payment has been given various terms: prepaid nonrefundable fee; prepaid nonrefundable retainer; earned on receipt retainer; or advance payment retainer.

Despite the fact that the parties agreed that the retainer was nonrefundable, The Florida Bar Committee on Professional Ethics states that a prepaid nonrefundable fee, or a portion of such fee, may be re-

fundable if the legal services are not performed.

Further, the comment to Rule 4–1.16 of the Rules Regulating The Florida Bar states:

**Refunding advance payment of unearned fee**

Upon termination of representation, a lawyer should refund to the client any advance payment of a fee that has not been earned. This does not preclude a lawyer from retaining any *reasonable* nonrefundable fee that the client agreed would be deemed earned when the lawyer commenced the client's representation. See also rule 4–1.5.

(Emphasis supplied).

In addition, Rule 4–1.05(a) of the Rules Regulating The Florida Bar prohibits an attorney from entering an agreement or collecting a fee which is "clearly excessive."

 The Court concludes that in Florida, all or a portion of a "prepaid nonrefundable retainer" is refundable if it is attributable to services which are not performed, or if it is clearly excessive.

 Additionally, under federal law, all or a portion of a "prepaid nonrefundable retainer" paid to a lawyer for a debtor or a debtor in possession is refundable. The standard to be applied when evaluating a retainer under the Bankruptcy Code is a standard of reasonableness.

 Section 328(a) of the Bankruptcy Code provides for a review of the terms and conditions of employment and compensation for an attorney for a trustee, a debtor in possession, or a committee. Pursuant to § 328, the arrangements for compensation of a lawyer for a debtor in possession must be approved by the court, and the terms must be reasonable.

 Whether or not such attorney applies for compensation under the Bankruptcy Code, Section 329 provides that the Court may order the return of compensation paid within one year prior to the case to an attorney representing a debtor in a bankruptcy case, or in connection with such a case, if such compensation exceeds the reasonable value of the services.

Consideration was given to the treatment of retainers under the Bankruptcy Code in a jurisdiction where the state law allows "earned on receipt" retainers, in the case of *In re Heritage Mall Associates,* 184 B.R. 128, 134 (Bankr.D.Or.1995). The Court determined that "earned on receipt" retainers or "advance payment" retainers were not automatically prohibited by the Bankruptcy Code, that sections 328 and 329 preserve the authority of the court to monitor and approve the fees paid by debtors to attorneys, and that the amount of the fees may be reviewed for reasonableness. The Court enumerated factors that may be considered in determining whether such compensation terms or payments are reasonable. Citing *In re Knudsen Corporation,* 84 B.R. 668 (9th Cir. BAP 1988) and *In re Dividend Development Corp.,* 145 B.R. 651 (Bankr.C.D.Cal.1992), and adding its own considerations, the Court listed some of the factors that may be relevant when considering the reasonableness of an "earned on receipt" retainer: (1) whether the case is an unusually large or complex case in which an exceptionally large amount of fees might accrue each month; (2) whether the court is convinced that waiting an extended period for payment would place an undue hardship on counsel; (3) whether the court is satisfied that the firm can respond if disgorgement is ordered; (4) the experience of the professionals involved; (5) whether the firm or other professionals have been precluded from accepting other employment in order to take the debtor's case; (6) whether that portion of the retainer which is "earned on receipt" is reasonable in its amount; and (7) whether the existence of the fee agreement has been adequately disclosed to the court and other interested parties. Some courts have concluded that a prepaid nonrefundable retainer is inherently unreasonable in bankruptcy. See *In re Bressman,*

214 B.R. 131 (Bankr.D.N.J.1997), and *In re NBI, Inc.*, 129 B.R. 212 (Bankr.D.Colo. 1991).

■■■ The case is an unusually large and complex case, and the firm is a small firm which would need regular payments to meet its operating needs. However, the reasonableness of the payment of $1,305,-419 as a prepaid nonrefundable retainer to a small professional corporation is clearly questionable. In retrospect, it is apparent that such payment was unreasonable, because Massari & Bell, P.A. was not able to comply with this court's order to repay $683,543.69 of the retainer that was admittedly unearned.[1]

The only issue at this time, however, is whether the Court has the authority to order the return of all or a portion of the "prepaid nonrefundable retainer." Clearly, the Court has such authority.

## V. Conclusion

Massari & Bell, P.A. received the amount of $2,117,380.23 between July of 1997 and March 31, 1998. The entire amount received was paid "in contemplation of or in connection with" the bankruptcy case, and is subject to review under § 329 of the Bankruptcy Code. In the Disclosure of Compensation of Attorney for Debtor, Massari & Bell, P.A. disclosed only that it had received the amount of $867,000. Consequently, Massari & Bell, P.A. violated § 329(a) of the Bankruptcy Code by failing to disclose the compensation paid to it within one year prior to the filing of the chapter 11 petitions. Massari & Bell, P.A. should return to the estate the amount of $1,305,419, representing the Chapter 11 retainer received by it prepetition, as a sanction for the violation.

Additionally, § 327 of the Bankruptcy Code provides that a debtor in possession may employ professional persons who do not hold an interest adverse to the estate and who are disinterested, "with the court's approval." The employment of Massari & Bell, P.A. was never approved by the Court in this case, and therefore Massari & Bell, P.A. is not entitled to an award of compensation for its postpetition services. Further, the Respondents were not "disinterested" within the meaning of § 327 of the Bankruptcy Code as a result of multiple transactions and relationships with insiders of the Debtors and related nondebtor companies. The Respondents did not disclose their relationship with the insiders or the related companies as required by § 327 and Rule 2014 of the Federal Rules of Bankruptcy Procedure. Such a failure to disclose, under the circumstances of this case, warrants disgorgement of the Chapter 11 retainer received by Massari & Bell, P.A. in the amount of $1,305,419, and denial of all fees claimed pursuant to the retention letter dated December 15, 1997.

Finally, the Court determines the reasonableness or excessiveness of the compensation received by Massari & Bell, P.A. apart from the retention letter dated December 15, 1997. Specifically, Massari & Bell, P.A. received $525,000 under the retention letter dated March 5, 1997, and $286,961.23 for rendering opinions in connection with the bulk loan sales. Such fees are subject to review under § 329 of the Bankruptcy Code since they were paid "in contemplation of or in connection with" the Debtors' bankruptcy cases. Pursuant to § 329(b), the Court finds that the fees exceed the reasonable value of the services provided. A reasonable fee for the services rendered under the March 5, 1997,

---

1. Pursuant to the Court's Order entered July 2, 1998, Massari & Bell, P.A. returned $300,-000 of the retainer. Additionally, Massari acknowledged at the hearing on these motions that an additional $683,543.69 of the retainer was not earned and should be repaid. On September 3, 1999, the Court entered an order directing Massari & Bell, P.A. to dis-

gorge the amount of $683,543.69 to the Trustee. Massari & Bell, P.A. did not comply with the disgorgement order, and on December 7, 1999, upon the express determination that there was no just reason for delay, the Court entered judgment against Massari & Bell, P.A. and in favor of the Trustee for the amount of $683,543.69.

agreement is $288,145.50, and a reasonable fee for providing the five opinions is $37,500, for a total of $325,645.50. In addition to disgorgement of the Chapter 11 retainer in the amount of $1,305,419, therefore, Massari & Bell, P.A. shall also return to the estate the sum of $485,925.73 ($525,000 + $286,961.23 = $811,961.23 received, less $325,645.50 reasonable compensation = $486,315.73 to be returned).

The total amount to be refunded by Massari & Bell, P.A. is $1,791,734.73 ($1,305,419 plus $486,315.73 = $1,791,734.73), less all amounts previously returned. The parties stipulated that Massari & Bell, P.A. previously refunded the sum of $300,000 pursuant to an Order entered on July 2, 1998. (Stipulation of Facts, ¶ 17). Additionally, the Court entered an Order on September 3, 1999, which directed Massari & Bell, P.A. to return to the estate unearned fees in the amount of $683,543.69. To the extent that any funds have been returned to the Trustee pursuant to that Order, Massari & Bell. P.A. shall be credited with the amount so returned.

Accordingly:

**IT IS ORDERED** that:

1. The Motion for Order Directing Attorney to Return Excessive Payments filed by Kevin O'Halloran, the Chapter 11 Trustee, is granted as set forth in this Order.

2. Massari & Bell, P.A. is ordered and directed to return to the estate the amount of $1,791,734.73, less all amounts previously returned, within sixty (60) days of the date of this Order.